NORCROSS S. TILNEY AND JOHN S. TILNEY, EXECUTORS OF THE LAST WILL AND TESTAMENT OF AUGUSTA MUNN TILNEY, DECEASED, APPELLANTS, v. WILLIAM KINGSLEY, ACTING DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY, RESPONDENT.

IN THE MATTER OF THE TRANSFER INHERITANCE TAX ASSESSMENT IN THE ESTATE OF AUGUSTA MUNN TILNEY, DECEASED.

Argued September 10, 1964—Decided October 19, 1964.

Mr. John Barker argued the cause for appellants (Mr. Robert P. Hazlehurst, Jr., of counsel; Messrs. Pitney, Hardin & Kipp, attorneys).

*Mr. Joseph A. Jansen,* Deputy Attorney General, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. The Director of the Division of Taxation determined that the proceeds of certain life insurance policies paid to named beneficiaries were transfers intended to take effect upon the death of the insured and hence were taxable under the transfer inheritance tax law. We certified the taxpayers' appeal before the Appellate Division acted upon it.

## I.

In 1937 the decedent, age 52 and uninsurable at normal rates because of a "low pulse rate," purchased combinations of single-premium life insurance policies and single-premium, non-refundable annuity contracts. Such combinations were obtained from three insurance companies. The total life insurance coverage was $150,000, and the premiums paid for these policies and the companion annuity contracts were 110% of the face amount of the insurance, *i. e.,* $165,000. The annual yield to decedent from the annuity contracts totaled $4,241.02, which is somewhat less than 3% of the total cost of the life insurance and the annuity contracts. No benefits were payable under the annuity contracts after the decedent's death.

In form the insurance policies were independent of the annuity contracts. The premiums paid for the annuity contracts were the same that would have been payable for the annuity contracts alone, and the premiums paid for the life insurance were at standard rates. But none of the companies would have sold the insurance policy to the insured at standard rates because of the state of her health unless the enhanced risk of loss were offset by an annuity contract, the benefits of which would cease upon the insured's death. Hence the companies insisted upon a tie-in between the insurance policy and the annuity contract at the moment of sale. The companies

had no interest in the continuation of that tie-in because the annuity contract could not be surrendered and the company would gain if the insurance policy were. But the insured, having a diminished life expectancy, was much concerned with the continued subsistence of the life insurance. Just as the company wanted the annuity contract to offset its increased risk under the life insurance policy, so the insured would want the life insurance policy to remain to compensate for the poor bargain the non-refundable annuity contract would be if it stood alone. Thus as a practical matter the tie-in persisted. And, of course, again at the level of the economic reality, if both contracts were continued as sensibly they had to be, the life insurance benefits of $150,000 would be payable out of the $165,000 paid for both the insurance policies and the annuity contracts.

Thus the transactions involved no life insurance risk, *i. e.,* a risk of loss because of death. A loss to the insurer under the life insurance policy because of early death would be offset by the gain to it under the annuity contract. The hedge was perfect. The only hazard to the company was that its own investments might yield less than what it had to pay under the annuity contract, a risk typical of an investment transaction rather than of life insurance. The cost of selling the contracts and the administrative expenses presumably were covered by the 10% charge made by each carrier over the face amount of the insurance.

In 1941 decedent assigned to the beneficiaries all of her rights in the life insurance policies. She died in 1959.

## II.

Our statute, *N. J. S. A.* 54:34–1c, makes taxable a transfer "by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after such death." We are not here concerned with the phrase "made in contemplation of the death" of the transferor because of the time

limitation in the statute. The question is whether there was a transfer "intended to take effect in possession or enjoyment on or after such death."

The transaction with each company, viewed as the single bargain it actually was despite the formal division between a life insurance policy and an annuity contract, falls quite literally within the statutory reach. The insured transferred $165,000 in exchange for promises to pay her a stated annual sum for life and to pay $150,000 to the beneficiaries upon her death. Her intent was that the gift to them should take effect in enjoyment on or after her death. The transaction makes no economic sense except in those terms.

Thus viewed, the legal issue is no different from that presented by a refund annuity contract under which benefits remaining unpaid at the annuitant's death are thereupon payable to others, as to which we have held there is a transfer to such others intended to take effect in possession or enjoyment upon the transferor's death. *Cruthers v. Neeld,* 14 *N. J.* 497 (1954); *Central Hanover Bank & Trust Co. v. Martin,* 129 *N. J. Eq.* 186 (*Prerog.* 1941), aff'd 127 *N. J. L.* 468 (*Sup. Ct.*), aff'd 129 *N. J. L.* 127 (*E. & A.* 1942), affirmed with respect to unrelated issues *sub nom. Central Hanover Bank & Trust Co. v. Kelly,* 319 *U. S.* 94, 63 *S. Ct.* 945, 87 *L. Ed.* 1282 (1943). See Annotation, 73 *A. L. R. 2d* 157, 184 (1960).

Precisely in point is *Bank of New York v. Kelly,* 135 *N. J. Eq.* 418 (*Prerog.* 1944). There, too, the insured, age 69, acquired simultaneously both a non-refundable annuity contract and a life insurance policy in exchange for $100,000, plus an additional 10% "loading charge." The insured received $1,470.63 annually under the annuity contract, and on his death the sum of $100,000 was paid to others under the life insurance policy. There, too, the company would not have sold the insurance policy without medical examination except in conjunction with the annuity policy which provided the company with the protective hedge we have already described. The court held the combination life insurance-annuity contracts resulted in a transfer of $100,000 in the form of the

insurance proceeds, a transfer intended to take effect in possession and enjoyment upon the transferor's death and hence taxable under our statute.

The court there added that the insurance was not "life" insurance within the meaning of *N. J. S. A.* 54:34–4f, which exempts from taxation the proceeds of life insurance policies payable to named beneficiaries. Indeed that much apparently was conceded by counsel in the light of *Helvering v. LeGierse,* 312 *U. S.* 531, 61 *S. Ct.* 646, 85 *L. Ed.* 996 (1941), and *Keller v. Commissioner,* 312 *U. S.* 543, 61 *S. Ct.* 651, 85 *L. Ed.* 1032 (1941), which held that since the essence of life insurance is protection against the risk of death, a statute designed to favor, by exemption from taxation, the spreading of the risk of· death by life insurance would not apply where, as here, the risk of death is not spread but rather is offset by an annuity contract. And we add in passing that the taxpayers in the case before us do not question that proposition.

To the same effect as *Bank of New York v. Kelly* is *Barillet v. Kelly,* 131 *N. J. L.* 140 (*Sup. Ct.* 1944). There the annuity contract and the life insurance policy were obtained on the life of the husband, age 70, the husband buying the annuity contract and the wife buying the life insurance policy, using however funds furnished by the husband. There too the company would not have sold the life insurance contract without the annuity contract, and the premiums paid for both contracts totaled 110% of the life insurance proceeds. Upon the insured's death, an inheritance tax was imposed upon the sum so furnished to the wife and paid by her to the company as the premium for the life insurance.[1] The tax was upheld, the court finding the cash gift to the wife was intended to take effect in possession or enjoyment at or after the donor's death. As to the further point there urged, that the gift be deemed effective in enjoyment at once because the wife held the irrevocable right to obtain the cash surrender value, the court an-

---

[1] It is not clear why the State did not seek to tax the full proceeds of the insurance policy.

swered in part that "there is no proof that such was the intention" (*p.* 146).

In the case before us the taxpayers stress the fact that in 1941 the insured parted with all property rights in the insurance policies and contend that thereupon the transfer to the beneficiaries took effect in possession and enjoyment. To support this thesis the taxpayers rely heavily upon *Fidelity-Philadelphia Trust Co. v. Smith,* 356 *U. S.* 274, 78 *S. Ct.* 730, 2 *L. Ed. 2d* 765 (1958).

The cited case involved combination life insurance-annuity contracts indistinguishable from those before us. The precise question was whether the life insurance proceeds came within *section* 811(c)(1)(B) of the Internal Revenue Code of 1939 which included in the gross estate any transfer without full consideration under which the decedent "has retained for his life * * * the possession or enjoyment of, or the right to income from, the property" transferred. The majority of the Court held that notwithstanding the indivisible nature of the total transaction in its inception, the insured did part completely with his interest in the life insurance, and since contractually the annuity was payable from the annuity contracts and not from the insurance policies, it followed that the insured had retained no right to income from the property transferred, *i. e.,* the insurance policies. The dissenters, treating the transaction as it began, *i. e.,* an "investment" to yield income for life with the proceeds payable to the beneficiaries, found the statutory provision covered the case perfectly.

The majority in *Fidelity-Philadelphia* went beyond holding that the precise statutory provision we quoted above did not embrace the case before it. Noting that the Government did not seek to reach the transfer under *section* 811(c)(1)(C) as one "intended to take effect in possession or enjoyment at or after" the transferor's death, the successor provision to the one successfully invoked by the Government in *LeGierse, supra* (312 *U. S.* 531, 61 *S. Ct.* 646, 85 *L. Ed.* 996), the majority suggested that *LeGierse* was different because there the insured had retained reversionary interests in the life insur-

ance whereas in *Fidelity-Philadelphia* the insured parted completely with any interest in the life policies. Thus, although only as *dictum,* the majority did say that if a transferor conveys his entire interest, it would follow that the transfer is not one "intended" to take effect in possession or enjoyment at or after death.[2]

The taxpayers before us stress both the holding and the *dictum* of *Fidelity-Philadelphia.* They seek to utilize the holding (that the income retained for life ensues only from the annuity contract and hence the transfer of the life insurance was not within the federal provision dealing with retention of a right to income from the subject of the transfer), by referring to decisions in our State that where income is so reserved from the property transferred, the transfer will be held to have been intended to take effect in possession or enjoyment at or after the transferor's death. See *Darr v. Kervick,* 31 *N. J.* 476, 483–84 (1960). But that rule of construction does not exhaust the scope of our statute. It establishes only that transactions of that character come within the act. It does not follow that whenever income is not retained the transfer must be beyond the statute. On the contrary, the statute plainly requires only an intention that the transfer take effect in possession or enjoyment at or after the death of the transferor. If such is the intent and ultimately the fact, it does not matter whether the transferor retained an interest in the thing transferred or whether title as such vested in the transferee before the transferor's death. *Schroeder v. Zink,* 4 *N. J.* 1, 9 (1950) ; *Hartford v. Martin,* 122 *N. J. L.* 283, 286–287 (*E. & A.* 1939) ; *In re Hollander,* 123 *N. J. Eq.* 52, 55–56 (*Prerog.* 1938) ; *Hasbrouck v. Martin,* 120 *N. J. Eq.* 96, 102 (*Prerog.* 1936) ; *cf. Cruthers v. Neeld, supra* (14 *N. J.,* at

---

[2] We gather the Government did not press *section* 811 (c) (1) (C) because after *LeGierse* and before *Fidelity-Philadelphia* the section was amended to include such a transfer in the gross estate only if the transferor retained a specified reversionary interest. See trial court's opinion in *Fidelity-Philadelphia Trust Co. v. Smith,* 142 *F. Supp.* 561 (*E. D. Pa.* 1956).

*pp.* 502–03) ; *Bose v. Division of Taxation,* 5 *N. J. Super.* 266, 269–70 *(App. Div.* 1949), certif. denied 4 *N. J.* 74 (1950).

Nor can we justifiably depart from this view on the strength of the *dictum* in *Fidelity-Philadelphia,* that the intended-to-take-effect provision does not apply if the transferor parted with his entire interest in the thing transferred. This, of course, is not to question that view of the federal law, but rather to say that our statute has its own history and its own ambit. *Schroeder v. Zink, supra,* 4 *N. J.,* at *p.* 13. We note, for example, that the Congress has provided for the separate taxation of *inter vivos* gifts, whereas in our State such gifts are taxable, if at all, under the transfer inheritance tax law. We note also that whereas historically the federal statute expressly included life insurance proceeds in the gross estate, thus suggesting that they would not be within the intended-to-take-effect provision as it existed at the time of *LeGierse,* our own statutory history is quite different. In our State, after a strong suggestion in *In re Gemmell,* 123 *N. J. Eq.* 315 *(Prerog.* 1938), that insurance proceeds payable to a named beneficiary would be taxable as a transfer intended to take effect at or after the death of the insured, the Legislature, acting upon that view of our intended-to-take-effect provision, carved out exemptions for life insurance by amendatory legislation.[3] Hence we cannot correctly accept an interpreta-

---

[3] A contrary view of the taxability of insurance proceeds had been advanced in *Fagan v. Bugbee,* 105 *N. J. L.* 85 *(Sup. Ct.* 1928). There the court assumed insurance proceeds payable to a named beneficiary would not be subject to tax because the transfer was accomplished by "contract" (incidentally that result accords with the result reached elsewhere under statutes which do not specifically tax such insurance proceeds, see, Annotation, 73 *A. L. R. 2d* 157, 171, 179–80 (1960) ), but the court nonetheless held the proceeds were taxable because the policy was payable to a trustee charged with duty to distribute to others. Thereupon the Legislature amended the section dealing with exemptions, now *N. J. S. A.* 54:34–4, by adding subsections "b" and "c" which exempt insurance proceeds payable to a trustee in such circumstances. This history appears in *In re Gemmell, supra* (123 *N. J. Eq.,* at *p.* 317). In *Gemmell* the policy was originally payable to the

tion of the federal statute as truly expository of our own even if the statutory provisions viewed in isolation seem to be the same.[4]

We cannot differentiate between the case in which the insured-annuitant parts with his entire interest in the life insurance and the case in which he does not. In tax matters it is acutely true that the substance prevails over the form of things. *Darr v. Kervick, supra,* 31 *N. J.,* at *p.* 483. So viewing the insurance-annuity contracts, we find them united in substance throughout. As we have said, the insured intends the life insurance to continue, whether in his hands or the hands of another, for if it is surrendered, the insured will retain the poor end of the integrated bargain. And in truth the transfer of the insurance policy to another does not sever it economically from the annuity, for the fact persists that the premium received for the annuity will be drawn upon to pay the life insurance proceeds, no matter how separate the transactions appear on the books of the company.

Hence we conclude that the sums paid to the beneficiaries were transfers intended to take effect in possession and enjoyment at or after the transferor's death. And, as we noted above and seemingly universally held, the contracts under which those sums were paid, although in form they are policies of insurance, do not come within the insurance exemption in *N. J. S. A.* 54:34–4, since in fact they were tied in with the annuity contracts and were not designed to spread the risk of death within the purpose of the exemption. The same result has been reached elsewhere under statutory schemes apparently like ours. *Day v. Walsh,* 132 *Conn.* 5, 42 *A.* 2d

insured's estate. The insured then named his wife as beneficiary. The court held the change of beneficiary constituted a transfer intended to take effect at or after the insured's death. The court questioned the *dictum* in *Fagan* that a policy originally payable to a beneficiary would be beyond the reach of the statute. Thereupon *L.* 1939, *c.* 303, added subsection "f" exempting insurance payable to a beneficiary other than the insured's estate and subsection "g" exempting the surrender or exercise of a power to change the beneficiary.

4 See fn. 2, *supra.*

366 (*Sup. Ct. Err.* 1945) ; *In re Smiley's Estate,* 35 *Wash.* 2d 863, 216 *P.* 2d 212 (*Sup. Ct.* 1950).

### III.

■ These views dispose also of the subsidiary point raised, that the proceeds should not be taxed to the extent of the surrender value of the life insurance policies. Of the $165,000 paid the companies by the insured, $92,363.50 was allocated to the life insurance. At the end of the first year, when the policies could first be surrendered under their terms, the cash surrender value was $74,866. When the insured relinquished all incidents of ownership in the policies in 1941, the surrender value was $82,422, and immediately prior to her death, the value was a little under $123,000.

It is perfectly plain that the insured did not intend that the transferees surrender the insurance policies. See *Bank of New York v. Kelly, supra,* 135 *N. J. Eq.,* at *pp.* 422–23, and *Barillet v. Kelly, supra,* 131 *N. J. L.,* at *p.* 146. To do so would have defeated the purpose of the total transaction, leaving the insured with unfavorable annuity contracts she would not have bought alone. The intent had to be that the life insurance continue until death, for only then could the insured achieve her aim that the $150,000 deposited with the companies would be delivered to the objects of her beneficence. It is of no moment that the transferees could have disappointed the insured and cashed in the policies. The fact is that they did not. In this connection, see *In re Schmidlapp's Estate,* 236 *N. Y.* 278, 140 *N. E.* 697, 699 (*Ct. App.* 1923) ; *In re Madison's Estate,* 26 *Cal.* 2d 453, 159 *P.* 2d 630, 635–36 (*Sup. Ct.* 1945) ; *Fabian v. Walsh,* 134 *Conn.* 456, 58 *A.* 2d 384, 385–86 (*Sup. Ct. Err.* 1948).

The assessments are accordingly affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.