773 A.2d 674

STRYKER CORPORATION, A MICHIGAN CORPORATION,
PLAINTIFF–APPELLANT, v. DIRECTOR, DIVISION
OF TAXATION, DEFENDANT–RESPONDENT.

Argued March 27, 2001—Decided June 14, 2001.

142

*Michael A. Guariglia* argued the cause for appellant (*McCarter & English*, attorneys; *Mr. Guariglia, Margaret C. Wilson, Charles M. Costenbader* and *Clement J. Farley,* on the briefs).

*Gail L. Menyuk,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel).

*Philip Kirschner* submitted a brief on behalf of *amici curiae,* New Jersey Business & Industry Association and New Jersey State Chamber of Commerce.

The opinion of the Court was delivered by

COLEMAN, J.

This appeal requires us to decide whether a New Jersey manufacturer that ships its products to out-of-state locations at the behest of its wholly-owned subsidiary, a New Jersey corporation, must include the sales in its allocation factor under *N.J.S.A.* 54:10A–6(B) of the New Jersey Corporation Business Tax Act (CBTA). In a "drop-shipment" transaction, a manufacturer sells merchandise to a dealer but ships the merchandise directly to the customer of the dealer. The Appellate Division held that the receipts earned by Michigan-based Stryker Corp., a manufacturer of hip and knee replacements, from its wholly-owned subsidiary, a New Jersey corporation, in a drop-shipment context are includible in the numerator of Stryker's receipts fraction under *N.J.S.A.* 54:10A–6(B)(6) of the CBTA because the receipts were earned within New Jersey. We agree with that determination and now affirm.

I.

The facts of this case were stipulated by the parties. Stryker is a Michigan corporation. It has manufacturing facilities in several states, including one in Allendale, New Jersey. The Allendale facility is the only place where Stryker manufactures orthopedic

hips and knees. It sells those products domestically through a wholly-owned subsidiary, Osteonics Corporation, a New Jersey corporation. There is no dispute, however, that Stryker and Osteonics operate independently and are treated as separate corporate entities for purposes of the CBTA.

Osteonics operates out of the same Allendale facility, which it subleases to Stryker. Stryker pays for the costs of the Allendale facility up front and then adds Osteonics's share of those costs to the price it charges Osteonics for its products. Osteonics markets and sells Stryker's products and then transmits its customers' orders to Stryker's computers. Stryker then packs and ships the products from the New Jersey facility "F.O.B. Allendale" via common carrier directly to Osteonics's customers. Osteonics has customers both in New Jersey and out of state. Osteonics subsequently bills the customers at a price that allows a gross profit margin of about 20% for its services. The balance of those receipts is forwarded to Stryker. Stryker sells its products to Osteonics at a price that includes, in addition to reimbursement for expenses incurred at the Allendale facility, manufacturing expenses and a profit margin for Stryker. That operating procedure is known as a "drop-shipment" transaction in which the retailer, here Osteonics, sells but does not take possession of the manufacturer's products because the manufacturer, here Stryker, directly delivers its products to the retailer's customers.

In June 1994, the Director of the Division of Taxation (Division), after auditing Stryker, issued a notice of assessment informing Stryker that it owed $1.326 million plus interest in unpaid corporate business taxes for the audit years of 1988 through 1992 based on the receipts Stryker generated from sales to Osteonics. During those years, Stryker prepared its New Jersey tax returns by including in the numerator of the receipts fraction of the CBTA only those sales to Osteonics in which the orthopedic products were shipped to a New Jersey customer. The Division sought to require Stryker to include receipts, not just from sales to Osteonics shipped to New Jersey customers, but receipts from all of

Stryker's sales to Osteonics regardless of where the products were shipped.

Stryker filed an administrative protest of the assessment in September 1994. In February 1996, the Division sent Stryker a final determination letter setting forth a CBTA assessment of $2,115,807 for the audit years, which included accrued interest. Stryker subsequently filed a five-count complaint in the Tax Court appealing the final determination of the Division. *R.* 8:2(a).

In a published opinion, the Tax Court affirmed the assessment, albeit on a different ground. *Stryker Corp. v. Director, Div. of Taxation,* 18 *N.J.Tax* 270, 291 (Tax 1999). The Tax Court held, contrary to the Division, that the sales were not within *N.J.S.A.* 54:10A–6(B)(1) because Stryker made no "shipment" of products to Osteonics as required by that subparagraph. *Id.* at 284. The court noted that Osteonics received neither physical possession nor physical control over the merchandise. *Ibid.* Nevertheless, in sustaining the assessment, the Tax Court held that the income that Stryker derived from its sales to Osteonics fell within *N.J.S.A.* 54:10A–6(B)(6), namely, "all other business receipts ... earned within the State," because Stryker was located in New Jersey and sold merchandise located in New Jersey to a dealer also located in New Jersey. *Id.* at 287. The Tax Court therefore entered judgment against Stryker for unpaid corporation business taxes of $1,326,204 for the years 1988 through 1992 with interest of $789,603 through February 1996. *Id.* at 291.

In a published opinion, the Appellate Division affirmed the judgment of the Tax Court. *Stryker Corp. v. Director, Div. of Taxation,* 333 *N.J.Super.* 413, 417, 755 *A.*2d 1200 (2000). The panel expanded the Tax Court's reasoning to answer Stryker's argument that the reference in subparagraph (6) to "other" business receipts does not apply to it because its receipts were not "other" business receipts but, rather, were like the receipts referred to in paragraphs (1) and (2). *Ibid.* The Appellate Division rejected that assertion, finding that that claim was "only a variation on the constant theme" of Stryker's argument. *Id.* at 417,

755 *A*.2d 1200. The theme was that the Director "should treat as one transaction what Stryker has chosen to treat as two", i.e., the sale to Osteonics and Osteonics's sale to its own customer. *Ibid.*

The court further observed that paragraphs (1) and (2) of *N.J.S.A.* 54:10A–6(B) concern receipts from sales in which the seller consummates the sale by shipping the product to the buyer. *Id.* at 417–18, 755 *A*.2d 1200. In those circumstances, the statute makes the destination of the shipment determinative. *Id.* at 418, 755 *A*.2d 1200. Therefore, income from Stryker's shipments to its own out-of-state customers would not be included. *Ibid.* However, the Appellate Division pointed out that the disputed receipts are in a different category because they are from sales in which the products are shipped to someone other than Stryker's direct customers. *Ibid.*

The Appellate Division concluded that the disputed receipts should be treated as New Jersey receipts under the CBTA for the purpose of calculating the receipts fraction of the allocation formula. *Id.* at 419, 755 *A*.2d 1200. The panel reasoned that "Stryker chose its mode of operation and, insofar as New Jersey is concerned, it is free to alter it." *Ibid.* We granted Stryker's petition for certification, 165 *N.J.* 605, 762 *A*.2d 219 (2000), and now affirm.

## II.

### A.

Corporations have been taxed in this State since 1884 when the Legislature adopted "[a]n act to provide for the imposition of State taxes upon certain corporations and for the collection thereof." *L.* 1884, *c.* 159; Robert J. Martin, *Calling in Heavy Artillery to Assault Politics as Usual: Past and Prospective Deployment of Constitutional Conventions in New Jersey,* 29 *Rutgers L.J.* 963, 1002 n. 155 (1998) ("Corporate taxes date back to 1884, when a franchise tax was imposed upon all domestic corporations."). That act, later compiled under Chapter 13 of Title 54 of the Revised Statutes, subjected certain corporations to an annual fee or fran-

chise tax. *N.J.S.A.* 54:13–11 to –15. The Legislature ultimately became dissatisfied with that corporate tax scheme because, under a separate statute, *L.* 1851, *p.* 271, a corporation's intangible personal property, such as stocks, bonds and notes, was valued for municipal tax purposes by the local assessors and at local rates. *Fedders Fin. Corp. v. Director, Div. of Taxation,* 96 *N.J.* 376, 390, 476 *A.*2d 741 (1984); *New Jersey Commission on Taxation of Intangible Personal Property, Report* 9–21 (1945) *(Commission Report).* That resulted in so-called "tax lightning" in which corporations became subject to sudden increases in assessments on their intangibles, especially in New Jersey's larger cities. *United States Steel Corp. v. Director, Div. of Taxation,* 38 *N.J.* 533, 539, 186 *A.*2d 266 (1962); *Statement to Assembly Bill No. 395 of 1945 (L.* 1945, *c.* 162).

Consequently, the Legislature adopted the Corporation Business Tax Act (CBTA), *L.* 1945, *c.* 162, replacing the prior corporate tax scheme with a uniform statewide tax on corporations. *N.J.S.A.* 54:10A–1 to –40; *United States Steel, supra,* 38 *N.J.* at 539, 186 *A.*2d 266 ("'The Corporation Business Tax Act (1945) was adopted because of dissatisfaction with prior law under which intangible property was taxable Ad valorem at the substantial rates applicable to realty and tangible personalty."). The CBTA imposes a tax on every foreign or domestic corporation, not otherwise exempt, "for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State." *L.* 1945, *c.* 162, § 2 *(N.J.S.A.* 54:10A–2). In direct response to the prior corporate tax system, the CBTA provides that "such franchise tax shall be in lieu of all other State, county or local taxation ... measured by intangible personal property." *Ibid.*

In the case of a corporation that "maintains a regular place of business outside this State other than a statutory office," Section 6 of the CBTA provides that such a corporation is to be taxed only on that portion of its income and worth that approximates the

contribution that tangible assets and employees located in New Jersey and receipts earned here have made to the corporation's entire net income. *N.J.S.A.* 54:10A–4(b); *N.J.S.A.* 54:10A–6. Thus, the statute, "particularly § 6 thereof, reflects the recognition that the business activity of a multi-state enterprise within one particular state is inadequately measured by the worth of its assets or income in that state alone, but is enhanced by the activity of the entire enterprise." *American Tel. & Tel. v. Director, Div. of Taxation,* 4 *N.J.Tax* 638, 648 (Tax Ct.1982), *aff'd,* 194 *N.J.Super.* 168, 476 *A.*2d 800 (App.Div.), *cert. den.* 97 *N.J.* 627, 483 *A.*2d 157 (1984). The CBTA is intended "to permit the tax to reflect the extent to which each corporation engages in business activities *within* New Jersey." *Commission Report, supra,* at 63.

To that end, the CBTA establishes a three-factor formula for apportioning the income of out-of-state corporations to New Jersey. *N.J.S.A.* 54:10A–6.[1] During the audit years 1988 to 1992, the formula required that, in determining Stryker's CBTA liability, the corporation's entire net worth and entire net income should be multiplied by the average of three fractions specified in *N.J.S.A.* 54:10A–6 (A), (B) and (C). The denominators of those fractions represent the corporation's total (real and tangible) property, business receipts, and payroll, respectively—the numerators represent the corporation's New Jersey property, receipts, and payroll, respectively. *Ibid.*[2] *See also* Hon. David E. Crabtree, 43 *New Jersey Practice* State and Local Taxation § 22.7 (1999) (discussing at length determination of tax base under CBTA).

---

[1] The language of the statute was amended by *L.* 1995, *c.* 245, § 1 and applies to fiscal or calendar accounting years beginning on or after July 1, 1996. However, in this case, the CBTA was applied to the audit years of 1988 to 1992. Therefore, we must apply the previous form of the statute.

[2] *L.* 1995, *c.* 245 revised the allocation formula for out-of-state corporations by double-weighting the receipts fraction and specifically referring to it as the "sales fraction." This Court, like the courts below, will use the pre 1995 term "receipts fraction."

The only dispute in this case involves the amount Stryker is required to include in the numerator of the "receipts fraction" under *N.J.S.A.* 54:10A–6(B). Although seemingly uncomplicated, the Taxation Commission envisioned that "[t]he principal problem in connection with the allocation of gross receipts occurs in the specification of sales to be attributable to the taxing State." *Commission Report, supra,* at 78. *N.J.S.A.* 54:10A–6(B) defines the kinds of income in the numerator of the receipts fraction to include:

[R]eceipts of the taxpayer ... arising ... from

(1) sales of its tangible personal property located within this State at the time of the receipt of or appropriation to the orders where shipments are made to points within this State,

(2) sales of tangible personal property located without the State at the time of the receipt of or appropriation to the orders where shipment is made to points within the State,

. . . .

(6) all other business receipts ... earned within the State. . . .

The phrase "where shipments are made to points within this State" presently included in both (B)(1) and (B)(2) was not added to the CBTA until adoption of *L.* 1949, *c.* 236. That amendment appears to have been in response to concerns expressed in the *Second Report of the Commission on State Policy* (1947) at 92: "It has been suggested that the sales element of the gross receipts factor ... be modified to give more weight to the location of customers." That report stated that New Jersey's business community was concerned that the apportionment formula under Section 6 discriminated against companies that largely conducted their manufacturing activity in New Jersey but sold their products outside the State. *Id.* at 93. The 1949 amendment therefore addressed those concerns by establishing a destination sales formula under (B)(1) and (B)(2) in which receipts from the sales of tangible goods are apportioned based on the location of the customer rather than the place where the costs of performing the service are incurred.

At the same time, *L.* 1949, *c.* 236, added a new subparagraph under *N.J.S.A.* 54:10A–6(B) that required corporations to include in the receipts factor

(3) sales of any such property not located at the time of the receipt of or appropriation to the orders at any permanent or continuous place of business maintained by the taxpayer without the State, where the orders were received or accepted within the State. . . . For the purposes of this subsection (3), an order shall be deemed received or accepted within the State if it has been received or accepted by an employee, agent, agency or independent contractor chiefly situated at, connected with . . . or sent out from a permanent or continuous place of business of the taxpayer within the State[.]

[*L.* 1949, *c.* 346, § 2 (*N.J.S.A.* 54:10A–6(B)(3)).]

Thus, although the 1949 amendment to Section 6 of the CBTA established a destination sales formula under (B)(1) and (B)(2), the amendment contemporaneously expanded the receipts fraction to include receipts from tangible property if the orders were received or accepted in New Jersey and if the property was located in New Jersey at the time of the order, regardless of the destination. *N.J.S.A.* 54:10A–6(B)(3). In other words, after the 1949 amendment, a corporation did not have to include receipts from out-of-state purchasers in the numerator of the receipts fraction so long as the corporation did not receive orders and keep its tangible personal property in New Jersey.

The Legislature deleted subparagraph three of *N.J.S.A.* 54:10A–6(B) almost twenty years later. *L.* 1967, *c.* 51. There is no legislative history concerning the deletion of subparagraph three to *N.J.S.A.* 54:10A–6(B). However, in an April 1967 memorandum to then-Counsel to the Governor Lawrence Bilder, the Division of Taxation stated that Assembly Bill No. 825 (*L.* 1967, *c.* 51) was designed to remove "certain language from the sales allocation factor in order that the factor, in accordance with the original legislative intent, would be calculated entirely on a destination basis." More specifically, the Division was concerned that the CBTA created an inconsistency—a corporation's receipts from the sale of tangible property that was located and ordered in New Jersey were included in the receipts fraction (even when the property was destined to an out-of-state customer), "whereas

receipts from sales of property located in New Jersey at the time of the order where the property is shipped outside the State is [sic] not included in the receipts fraction. This amendment would avoid such inconsistency." *Ibid.*

### B.

Here, the Tax Court held that Stryker's disputed receipts did not fall within *N.J.S.A.* 54:10A–6(B)(1) because they did not involve physical "shipments ... made to points within this State." *Stryker, supra,* 18 *N.J. Tax* at 283–84. However, the Tax Court concluded that *"N.J.S.A.* 54:10A–6(B)(6) [was] applicable to [Stryker's] receipts from sales to Osteonics involving direct shipments by [Stryker] to Osteonics' out-of-state customers" because "[t]he transactions generating plaintiff's receipts were New Jersey transactions, and the receipts were earned in New Jersey." *Id.* at 287. The Appellate Division agreed with the Tax Court's conclusion and affirmed. *Stryker,* 333 *N.J.Super.* at 417–20, 755 *A.2d* 1200.

Stryker repeats its three main arguments raised before the Appellate Division. First, Stryker asserts that the New Jersey allocation formula, as construed by the lower courts, violates the commerce clause. Next, Stryker argues that its receipts are not "other business receipts" under (B)(6) of Section 6 of the CBTA. Lastly, Stryker argues that the Legislature repealed *N.J.S.A.* 54:10A–6(B)(3), which provided that sales of tangible property in which the orders were received in New Jersey would be treated as New Jersey income. Stryker maintains that the amendment deleting that subparagraph implies a legislative intent to exclude its disputed receipts from the numerator.

### III.

### A.

First, we address Stryker's argument that the lower courts' interpretation of the CBTA is not "internally consistent" as

required by the Commerce Clause of the United States Constitution. *U.S. Const.*, art. I, § 8. The United States Supreme Court has set forth a four-part test in determining whether a tax can be sustained against a Commerce Clause challenge: whether the tax (1) is applied to an activity with a substantial nexus to the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the state. *Complete Auto Transit, Inc. v. Brady*, 430 *U.S.* 274, 282, 97 *S.Ct.* 1076, 1081, 51 *L. Ed.*2d 326, 333 (1977). With regard to the second prong of the test, the Supreme Court has stated that

> we have assessed any threat of malapportionment by asking whether the tax is "internally consistent" and, if so, whether it is "externally consistent" as well. . . . Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intra-state.
>
> [*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 *U.S.* 175, 185, 115 *S.Ct.* 1331, 1338, 131 *L. Ed.*2d 261, 271–72 (1995) (citations omitted).]

In other words, the internal consistency test is a federal doctrine that requires a court to assume that all fifty states have a taxing scheme exactly the same as the taxing scheme under review. The internal consistency test therefore focuses on the text of the⸱ challenged statute and hypothesizes a situation in which other states have passed an identical statute. *Ibid.* To be internally consistent, a tax must be structured "so that if every State were to impose an identical tax, no multiple taxation would result." *Goldberg v. Sweet*, 488 *U.S.* 252, 261, 109 *S.Ct.* 582, 589, 102 *L. Ed.*2d 607, 617 (1989). One commentator, in analyzing the doctrine, has noted:

> This new doctrine resolves an old dispute in the application of the multiple taxation doctrine: whether the commerce clause prohibits taxes that create the risk of multiple taxation or only actual multiple taxation. The Court seemed for many years to vacillate on this issue, but the internal consistency doctrine makes clear that the focus is on another state's hypothetical tax. The doctrine is a bit different, however, from the traditional inquiry into the risk of multiple taxation, in which the

question was whether another state's application of a constitutionally permissible tax would result in multiple taxation. Internal consistency looks at the narrower issue of whether the same tax applied by all other states would create multiple taxation. *The internal consistency principle reflects a compromise between the Court's desire to allow the states flexibility in choosing an apportionment formula and its recognition that if different states use different formulas, multiple taxation inevitably results.* The Court therefore requires that, at the very least, a state's formula still not create multiple taxation if applied by all states.

[Seth Goldstein, Note, *'Resident' Taxpayers: Internal Consistency, Due Process, and State Income Taxation,* 91 *Colum. L.Rev.* 119, 132 (1991) (footnotes omitted and emphasis added).]

External consistency, on the other hand, looks to the economic justification for the State's claim upon the value taxed to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State. *Comm'n, supra,* 514 *U.S.* at 185, 115 *S.Ct.* at 1338, 131 *L.Ed.*2d at 272.

■ Stryker does not argue that the CBTA violates the principle of external consistency. Rather, Stryker argues that the receipts fraction of the CBTA, as the lower courts have interpreted it, is not internally consistent because it would subject multistate manufacturers to double taxation on drop shipments. Stryker asserts that if every state applied the lower courts' interpretation of the New Jersey CBTA, manufacturers would be taxed twice: once for their transactions with the dealer or wholesaler and a second time for their shipments of the products to the destination state of the customers. We reject that argument.

First, we must hypothesize that every state requires a manufacturer · to include, for corporate business tax purposes, receipts from the sale of products to a dealer or wholesaler that occurs in that state. We must further hypothesize that those states require the dealer, not the manufacturer, subsequently to allocate the sales of that product to the customer, if any, on a destination basis. Under that hypothetical tax structure, the transaction between the corporate manufacturer and the wholesaler would be treated separately from the transaction between the wholesaler and the customer in each state. Because no state would require the manufacturer to allocate the receipts from the dealer's sale of

the product to the customer on a destination basis, the lower courts' interpretation of New Jersey's receipts fraction does not present a threat of multiple taxation by other states.

As the Tax Court correctly articulated:

The test is whether the taxing posture "*if* applied by every jurisdiction" would result in multiple taxation. If every state regarded destination as irrelevant to the taxability of receipts earned in intrastate sales by a manufacturer to a dealer in drop-shipment transactions, no multiple taxation would result because the receipts from sales by the manufacturer to the dealer (here plaintiff to Osteonics) would be taxed only in the state in which the sales took place.

[*Stryker, supra,* 18 *N.J. Tax* at 290.]

New Jersey's CBTA would reach only the activity taking place within this State, namely, the receipts a New Jersey manufacturer gains from its sales to a New Jersey wholesaler. See *Oklahoma Tax Comm'n, supra,* 514 *U.S.* at 196, 115 *S.Ct.* at 1344, 131 *L.Ed.*2d at 278–79 (upholding state tax where threat of multiple taxation no greater "than those sales taxes that have passed muster time and again"). "Because plaintiff performed and provided, in New Jersey, all consideration for its sales to Osteonics, the receipts from those sales are taxable in New Jersey even though plaintiff shipped merchandise directly to Osteonics's out-of-state customers and may have elected to pay taxes in other states based on receipts from Osteonics relating to such shipments." *Stryker, supra,* 18 *N.J. Tax* at 290. Because the doctrine of internal consistency requires only that a tax be structured so that it would not result in multiple taxation if applied by *every state,* we hold that the lower courts correctly determined that New Jersey's inclusion under the CBTA of Stryker's receipts from its sales to Osteonics of merchandise that Stryker shipped directly to Osteonic's out-of-state customers would not violate the Commerce Clause of the United States Constitution.

## B.

Next, we decide whether Stryker's receipts from the sale of its product to a dealer in the context of a drop-shipment transaction are to be included in the numerator of the receipts fraction

under *N.J.S.A.* 54:10A–6(B)(6). As noted above, the Tax Court held that Stryker's disputed receipts did not fall within *N.J.S.A.* 54:10A–6(B)(1) because they did not involve physical "shipments ... made to points within this State." *Stryker, supra,* 18 *N.J. Tax* at 283–84. However, the Tax Court concluded that in a drop-shipment context, those receipts are includible in the numerator of Stryker's receipts fraction under *N.J.S.A.* 54:10A–6(B)(6) of the CBTA because the receipts were earned within New Jersey. *Id.* at 287. The Appellate Division affirmed. *Stryker,* 333 *N.J.Super.* at 417–20, 755 *A.*2d 1200. We agree with the conclusion of the lower courts.

▆▆▆ It is well settled that tax laws are to be "strictly construed against the state and in favor of the taxpayer." 3A Norman J. Singer, *Sutherland Statutory Construction* § 66.01 (5th ed.1992). Nevertheless, tax laws also must be construed reasonably so that the Legislature's purpose in enacting the statute is not destroyed. 3A *Sutherland, supra,* § 66.02. *See generally City of Long Branch v. Monmouth Med. Ctr.,* 138 *N.J.Super.* 524, 531, 351 *A.*2d 756 (App.Div.1976), *aff'd,* 73 *N.J.* 179, 373 *A.*2d 651 (1977) (observing tax exemption statute must be reasonably construed); *cf. Atlantic City Transp. v. Walsh,* 25 *N.J.Misc.* 483, 488, 55 *A.*2d 652 (Dep't Tax 1947) ("As a general rule, a liberal construction must be given all tax laws for public purposes, and it is the duty of the courts to see that no one, by mere technicalities which do not affect his substantial rights, shall escape his fair proportion of the public expenses, and thus impose them upon others."). In any event, because tax liability is established by way of revenue legislation, "all the rules of statutory construction are relevant in the interpretation of revenue measures." 3A *Sutherland, supra,* § 66.03.

▆▆▆ One such canon of construction is *ejusdem generis,* meaning, "when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the

preceding specific words." *State v. Hoffman*, 149 *N.J.* 564, 584, 695 *A.*2d 236 (1997). This Court has stated:

> The rule of *ejusdem generis* is in aid of construction where the expression is of doubtful meaning; and it has no application where the legislative design is expressed in plain and unambiguous terms. The doctrine is a specific application of the maxim *"noscitur a sociis;"* and it would be a perversion of its essential purpose if it were allowed to render general words meaningless. It is not an absolute formula that overrides all other canons of interpretation; and *it is never applied to defeat the legislative purpose* revealed by the provision in its entirety, giving to all the terms their normal sense and significance.... As with all other canons of construction, the doctrine yields to the intention revealed by the context, viewing the language in its ordinary acceptation.
>
> [*Edwards v. Mayor of Moonachie*, 3 *N.J.* 17, 23, 68 *A.*2d 744 (1949) (citations omitted and emphasis added) ].

The statute at issue specifically references four types of receipts or revenues that a corporation must include for tax purposes, including those that arise from (1) sales of tangible personal property in New Jersey in which such property is shipped to points within this State and (2) sales of tangible property located outside the State in which such property is shipped to points within this State. *N.J.S.A.* 54:10A–6(B)(1) & (2). Those types of receipts are followed by the catch-all provision under subparagraph six that applies to "all other business receipts" earned within the State. *N.J.S.A.* 54:10A–6(B)(6).

Stryker contends that (B)(6) is designed to capture the business income not covered more specifically by the prior subparagraphs. Because our Legislature adopted two provisions to specifically govern the types of tangible personal property receipts to be included in the numerator of the receipts fraction, (B)(1) and (B)(2), and because both of those provisions look solely to the destination of the physical shipment to determine whether the receipts will or will not be included in the numerator, Stryker argues that the lower courts' application of (B)(6) was improper. Stryker further points out that under current regulations, the CBTA's (B)(6) catch-all provision is generally applicable to intangible goods. *See N.J.A.C.* 18:7–8.12(a) ("Examples of such business receipts include, but are not limited to, interest income, dividends, governmental subsidies or proceeds from sales of scrap.").

On a similar note, Judge Crabtree, critiquing the *Stryker* decision in his *New Jersey Practice* treatise, observes that

[t]he plain language of the receipts fraction precludes the use of (B)(6) as a catch-all for sales of tangible personal property that are otherwise excluded from the numerator of the fraction because they are beyond the ambit of (B)(1) or (B)(2). It is a fundamental principle of statutory construction that the more specific language of a statute (here (B)(1) and (B)(2)) prevails over the merely general (here (B)(6)). Also, the language of (B)(1) and (B)(2), and (B)(6) leaves no doubt that "sales of ... tangible personal property" and "all other business receipts" do not overlap. Any other reading would require a finding of superfluous language, a result at variance with well-established rules of statutory construction.

[Crabtree, *supra,* § 22.7 (Supp.2000) (footnotes omitted).]

■ We reject Stryker's contentions. "The doctrine of *ejusdem generis* calls for more than merely an abstract exercise in semantics and formal logic." 2A *Sutherland, supra,* § 47.18. "The rule is not absolute in the sense of being arbitrary." *Infocomp Corp. v. Somerset Trust Co.,* 165 *N.J.Super.* 382, 389, 398 *A.*2d 557 (App.Div.1979). The rule of *ejusdem generis* "merely 'serves as a helpful guide in ascertaining legislative meaning.'" *Ibid.* (quoting *Salomon v. Jersey City,* 12 *N.J.* 379, 389, 97 *A.*2d 405 (1953).) "Such a rule must be subordinated to the paramount purpose of construing a statute to ascertain the legislative intent." *Ibid.* Although "the legislature ... enumerates specific objects or conditions which have come to their attention, ... this enumeration is not intended to limit the operation of the statute to the specific objects set forth." 2A *Sutherland, supra,* § 47.18. Thus, "[m]any modern commentators have been critical of the *ejusdem generis* rule because it creates a manifest bias toward the strict construction of statutes." *Hovbilt, Inc. v. Township of Howell,* 263 *N.J.Super.* 567, 572, 623 *A.*2d 770 (App.Div.1993), *aff'd,* 138 *N.J.* 598, 651 *A.*2d 77 (1994); 2A *Sutherland, supra,* § 47.18.

■ "A drop-shipment transaction is a three-party transaction which *masks the fact that there are actually two transactions,* the sale from [the manufacturer] to the ... dealer and the sale from the ... dealer to the dealer's customer." *Steelcase, Inc. v. Director, Div. of Taxation,* 13 *N.J.Tax* 182, 193 (Tax 1993) (em-

phasis added). As the Tax Court recognized, "[p]laintiff and defendant acknowledge that neither *N.J.S.A.* 54:10A–6 nor the Regulations under that statute, *N.J.A.C.* 18:7–8.1 to –8.17, contemplated three-party drop-shipment transactions." *Stryker, supra,* 18 *N.J. Tax* at 279. "[I]n any event, the subsection does not prohibit inclusion in the receipts fraction of receipts generated by transactions relating solely to New Jersey and not covered by subsection (B)(1) or any other subsection of Section 6(B)." *Id.* at 286. *N.J.A.C.* 18.7–8.12 defines the scope of subsection (B)(6) as follows:

> All other business receipts earned by the taxpayer within New Jersey are allocable to New Jersey. Other business receipts include items of income entering into the determination of entire net income during the year for which the business allocation factor is being computed and is not otherwise provided for in the rules. Examples of such business receipts *include, but are not limited to,* interest income, dividends, governmental subsidies or proceeds from sales of scrap.
>
> [*N.J.A.C.* 18.7–8.12 (emphasis added).]

"Under subsection (B)(6), the place to or from which shipment is made is not relevant to a determination of whether receipts must be included in the numerator of the receipts fraction." *Stryker, supra,* 18 *N.J. Tax* at 286. "The issue is solely whether the receipt was 'earned by the taxpayer within New Jersey.'" *Ibid.* Further, the express language of *N.J.A.C.* 18.7–8.12 indicates that the examples of "other business receipts" provided in the regulation are not exclusive.

Here, "[p]laintiff was located in New Jersey, and sold merchandise located in New Jersey to a customer also in New Jersey, Osteonics." *Id.* at 287. Thus, "the disputed receipts are 'other business receipts' within the meaning of *N.J.S.A.* 54:10A–6(B)(6) because they are receipts from a category of transactions which the statute differentiates from those enumerated in subparagraphs (B)(1) and (B)(2), *i.e.,* they are receipts from sales of products which the seller ships to someone other than its direct customers." *Stryker, supra,* 333 *N.J.Super.* at 418, 755 *A.*2d 1200.

We hold that neither (B)(1) nor (B)(2) should be interpreted as a limitation on the Division's right to include Stryker's

receipts in the allocation factor. Rather, the catch-all provision under (B)(6) should be interpreted to allow the Division to plug loopholes in the CBTA, such as here in which a tangible product is manufactured and sold in New Jersey to a New Jersey corporation and yet does not fall under one of the enumerated provisions. Allowing the catch-all provision to embrace such receipts is consistent with the powers that the Legislature has given the Division to adjust a corporation's allocation factors to "effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to the State." *N.J.S.A.* 54:10A–8(e).

Moreover, canons of construction cannot be used "to defeat the legislative purpose revealed by the provision in its entirety, giving to all the terms their normal sense and significance." *Edwards, supra,* 3 *N.J.* at 23, 68 *A.*2d 744. It is difficult to imagine that the Legislature would have intended a corporation such as Stryker to exclude from its receipts fraction—a fraction that by design is supposed to measure a corporation's New Jersey-related receipts—the receipts it obtains from the sale of tangible property manufactured in New Jersey and sold to a New Jersey wholesaler. The adoption of the CBTA was necessary to "to reflect the extent to which each corporation engages in business activities *within* New Jersey." Commission Report, *supra,* at 63. The inclusion of Stryker's receipts here is consistent with that goal.

It is true that the CBTA was amended shortly after enactment to follow a destination sales theory, meaning that the sale of tangible property should be allocated to the state where the product is delivered to the customer. *L.* 1949, *c.* 236. That amendment was intended to provide a more equitable apportionment formula under Section 6 for companies that conducted their manufacturing activity in New Jersey but sold their products outside the State. *Second Report of the Commission on State Policy* (1947) at 92–93. However, we have recognized that "[i]n tax matters, it is acutely true that the substance prevails over the form of things." *Tilney v. Kingsley,* 43 *N.J.* 289, 298, 204 *A.*2d 133 (1964). Thus, Stryker, which does not directly sell its ortho-

pedic knees and hips to out-of-state customers, does not fall under that category. Instead, Stryker realizes profits by making intrastate sales to its wholly-owned subsidiary, Osteonics. A manufacturer's choice to drop-ship goods to its customer's customer may be a sound business decision because it avoids costs and delays that might result when the goods are shipped to the original buyer, who then must arrange for a second shipment to the ultimate consumer. However, the choice by a manufacturer to engage in a drop-shipment transaction should not extinguish the tax consequences of the two separate transactions that occur. Furthermore, a drop-shipment transaction should not allow a manufacturer to enjoy an unfair tax advantage over a manufacturer that has chosen not to drop-ship its goods and that, consequently, would be required to include the receipts of the goods that were physically shipped to the wholesaler.

To require Stryker to include such sales in its receipts numerator does nothing to diminish the underlying goals of the destination sales theory because the wholesaler, not the manufacturer, would then apply that theory in apportioning its receipts from the customer. The phrase "other business receipts" thus should be used to ensure that corporations cannot argue that receipts are exempt from the CBTA simply because an intermediary was involved when the goods and the buyers were at all times within New Jersey. In that sense, a strict interpretation of the destination rule does not identify what is actually being done in New Jersey. The Legislature has not required that the ultimate destination of the product trump an examination of the transaction in New Jersey in order to determine receipts. Stryker's approach does not accurately reflect the activity that it conducts in this State. Therefore, we hold that Stryker's disputed receipts are includible in the numerator of the receipts fraction under *N.J.S.A.* 54:10A–6(B)(6).

## C.

■ Lastly, we must decide whether, by deleting subparagraph (3) of *N.J.S.A.* 54:10A–6(B), the Legislature intended to

preclude drop-shipment receipts from the CBTA. Stryker argues that when (B)(3) was removed from Section 6 of the CBTA in 1967, the Legislature intended to restrict the inclusion of sales in the receipts fraction to only those sales of tangible personal property in which shipment was made to points in New Jersey. We disagree.

 Section 6 of the CBTA was amended four years after its enactment to expand the receipts fraction to include the sales of tangible property if the orders were received or accepted in New Jersey and if the property was located in New Jersey at the time of the order. *L.* 1949, *c.* 346, § 2 (*N.J.S.A.* 54:10A–6(B)(3)). Although documents contained in the files of the Counsel to the Governor relating to tax legislation have been held not to constitute legislative history, they do provide insights into the Executive Branch's understanding of the law that are contemporaneous with the enactment of such legislation. *Liberty Mut. Ins. Co. v. State,* 17 *N.J.Tax* 457, 477–78 (Tax 1998).

Here, it is clear that *L.* 1967, *c.* 51 was designed to address an inconsistency in the CBTA, namely, that a corporation's receipts from the sale of tangible property that was located and ordered in New Jersey were included in the receipts fraction (even when the property was destined to an out-of-state customer), whereas receipts from sales of property located in New Jersey at the time of the order but shipped outside the State were not included in the receipts fraction. The amendment was intended to avoid such inconsistency. Gov. Counsel Files to *L.* 1967, *c.* 51, *supra.* The Appellate Division correctly concluded that the problem resolved by deleting subparagraph (B)(3) was much broader in scope than the issue raised by this appeal. *Stryker, supra,* 333 *N.J.Super.* at 419, 755 *A.*2d 1200. For instance, if Stryker manufactured and sold its products directly to out-of-state customers without Osteonics as an intermediary, (B)(3) nevertheless would have required the receipts from those out-of-state sales to be included under CBTA if the order was received in New Jersey. Although the Legislature sought to address the inconsistency between that

scenario and the destination sales theory, the elimination of subsection (B)(3) was not meant to ensure that manufacturers involved in a three-party drop-shipment transaction would exclude receipts from that transaction.

"Consequently, although it is true, as Stryker maintains, that the receipts from the sales at issue here would have been treated as New Jersey sales under the deleted provision of *N.J.S.A.* 54:10A–6(B)(3), the reason for the deletion is the breadth of its reach." *Ibid.* Like the Appellate Division, "[w]e cannot logically infer from its repeal that the Legislature intended to treat the disputed income at issue here—receipts from drop-shipments sent out of state—as non-New Jersey income." *Ibid.*

## IV.

In sum, we hold that the receipts that Stryker generated from the sale of its hip and knee replacements, manufactured in New Jersey and sold to its wholly-owned subsidiary at the same location, may be properly characterized as New Jersey receipts to be included in the numerator of the receipts fraction of the allocation formula prescribed in *N.J.S.A.* 54:10A–6. Although Stryker drop ships the product directly to the subsidiary's customers and the subsidiary never takes possession of the product, the purchasers are customers of the subsidiary, not of Stryker, and the income Stryker realizes from its sale of the product to its subsidiary is generated in New Jersey. The fundamental purpose of the apportionment statute and the three-factor formula it establishes is to achieve a fair apportionment to New Jersey of business conducted by a multi-state enterprise. *American Tel. & Tel., supra,* 4 *N.J. Tax* at 651. Thus, we hold that the lower courts' interpretation of Section 6(B) of the CBTA is consistent with that purpose.

## V.

The judgment of the Appellate Division is affirmed.

STEIN, J., concurring.

I join in the Court's comprehensive and well-reasoned opinion. I add these observations primarily to address the contention of *amici curiae* that the lower court's, and now this Court's, interpretations of the scope of the receipts portion of the apportionment formula for the New Jersey Corporation Business Tax Act, *N.J.S.A.* 54:10A–1 to –40, codified at *N.J.S.A.* 54:10A–6(B), will impose an undue burden on New Jersey manufacturers. *Amici* supports their argument by referring specifically to the 1995 amendment to *N.J.S.A.* 54:1–A–6, *L.* 1995, *c.* 245, pursuant to which the Legislature determined to double-weight the receipts fraction portion of the apportionment formula in order to benefit New Jersey manufacturers. According to *amici,* that legislative determination was designed "[to] provide an incentive for investment and employment in New Jersey," and to "shift[ ] the tax burden to corporations that sell their products in New Jersey and away from corporations that employ people or have capital investment in New Jersey." *Sponsors Statement to Assembly Bill No. 89,* at 2–3 (June 15, 1995).

*Amici* also relies on the Assembly Appropriations Committee statement to that bill:

Doubling the weight of the sales factor will decrease the apportioned taxable income of corporations that own property and pay salaries and wages in New Jersey, decrease the apportioned taxable income of corporations that make sales outside of New Jersey and increase the apportioned taxable income of corporations that make sales in New Jersey.

[Assembly Appropriations Committee, *Statement to Assembly Bill No. 89,* at 1 (June 1, 1995).]

Notwithstanding the Legislature's salutary purpose in amending *N.J.S.A.* 54:10A–6 to double-weight the receipts fraction of the allocation formula, the issue posed by this appeal is a unique one, and implicates interpretive issues that cannot be resolved merely on the basis of the legislative intent underlying the 1995 amendment to *N.J.S.A.* 54:10A–6. As the Tax Court observed: "Plaintiff and defendant acknowledge that neither *N.J.S.A.* 54:10A–6 nor the Regulations under that statute, *N.J.A.C.* 18:7–8.1 to –8.17, contem-

plated three-party drop-shipment transactions." *Stryker Corp. v. Director, Div. of Taxation,* 18 *N.J.Tax* 270, 279 (Tax 1999).

Responding to *amici*'s argument, the Director of the Division of Taxation asserted that if Stryker had used a division rather than a wholly-owned subsidiary to serve as its marketing arm, the sales in question would have been excluded from the numerator of the receipt's fraction:

> Further, it is not the Tax Court's holding that would stymie legislative action to give New Jersey manufacturers favorable tax treatment, as Stryker alleges.... Rather, the tax consequences here necessarily follow from Stryker's business decisions. The Director acknowledges, as he did below, that if Stryker had itself conducted the sales and marketing functions, rather than having a separate, wholly-owned subsidiary undertake those tasks, Stryker would have been entitled to exclude from the numerator of its receipts fraction those sales made to what would have been Stryker's out-of-state customers. As the Courts of this State have long and frequently noted, however, a voluntary business decision is to be given its tax effect in accordance with what actually occurred, rather than with what might have occurred.

Moreover, an unusual feature of the transactions between Stryker and its subsidiary Osteonics was the lack of written invoices to Osteonics for orders it placed. Rather, on a quarterly and annual basis, personnel from Stryker and Osteonics would attempt to calculate the price to be paid by Osteonics for products shipped by Stryker to its customers. That price was to reflect:

1. Reimbursement to Stryker for direct expenses incurred in manufacturing, warehousing, packaging and shipment of products sold to Osteonics.

2. Reimbursement of a portion of Stryker's rent, insurance, utilities and maintenance costs at the facility it shared with Osteonics.

3. Reimbursement for administrative services provided by Stryker to Osteonics; and

4. A profit margin for Stryker.

See *Stryker, supra,* 18 *N.J. Tax* at 275.

The Director's reply brief placed heavy emphasis on Stryker's unorthodox accounting practices to support the determination to assess a deficiency based on the exclusion from the receipts fraction numerator of the sales to Osteonics:

> Thus, while Stryker and the amici have portrayed this action as one with far-reaching consequences, it is not. If there was one single factor which motivated the assessment made against Stryker, it was the lack of written documentation as

to its sales transactions. Where a taxpayer fails to maintain its records in accordance with sound accounting practices or conducts its business or maintains its records in such manner as to distort its true income or the proportion thereof properly allocable to this State, or whenever any agreement, understanding or arrangement exists between a taxpayer and any other corporation whereby the activity or receipts of the taxpayer are improperly or inaccurately reflected, the Director is clearly authorized to adjust the allocation of entire net income. *N.J.S.A.* 54:10A–10.

We do not believe that Stryker's business practices are generally reflective of those of the membership of the Association and the Chamber. Those practices of Stryker's include: (1) incorporating Osteonics' rent payments and Osteonics' payments for Stryker's services into the sales price for the products purchased by Osteonics ...; (2) failing to issue and maintain invoices; and (3) the "settling up" of various charges and payments between the two companies but once a year....

Accordingly, I perceive no incompatibility between the Court's affirmance of the lower courts' dispositions and the legislative purpose to benefit New Jersey based manufacturers underlying the 1995 amendment to *N.J.S.A.* 54:10A–6.

As the Court's opinion emphasizes, *ante* at 161–62, 773 *A.*2d at 687–88, our disposition is driven primarily by Stryker's election to market its goods by means of drop shipments to the out-of-state customers of its New Jersey based subsidiary. In any event, if our interpretation of *N.J.S.A.* 54:10A–6(B)(6) misperceives the legislative intent, the Legislature is free to enact a clarifying amendment.

*For affirmance*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG and ZAZZALI—5.

*Opposed*—None.