798 A.2d 51

CONOR VELAZQUEZ, AN INFANT BY HIS MOTHER AND NATURAL GUARDIAN, CHARMAINE VELAZQUEZ, CHARMAINE VELAZQUEZ, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF CONOR VELAZQUEZ, AND JOSE VELAZQUEZ, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF CONOR VELAZQUEZ, PLAINTIFFS–RESPONDENTS, v. TERESA JIMINEZ, M.D., ST. PETER'S MEDICAL CENTER, ELLEN MAAK, R.N., JEANINE HEALY, R.N., AND JOHN DOES, M.D., DEFENDANTS, AND ANGELA C. RANZINI, M.D., DEFENDANT–APPELLANT.

Argued January 2, 2002—Decided May 29, 2002.

*Donald P. Jacobs* argued the cause for appellant (*Budd Larner Gross Rosenbaum Greenberg & Sade*, attorneys; *Cynthia A. Walters*, of counsel; *Mr. Jacobs* and *Scott E. Reynolds*, on the briefs).

*James M. Andrews* argued the cause for respondents (*Blank Rome Comisky & McCauley*, attorneys; *Mr. Andrews, Michelle F. McGovern* and *James Llewellyn Matthews*, on the brief).

The opinion of the Court was delivered by

LONG, J.

New Jersey's Good Samaritan Act, *N.J.S.A.* 2A:62A–1, provides:

Any individual, including a person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, or any person who is a volunteer member of a duly incorporated first aid and emergency or volunteer ambulance or rescue squad association, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof, or while transporting the victim or victims thereof to a hospital or other facility where treatment or care is to be rendered, shall not be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care.

The issue of first impression presented here is whether that statute can be invoked to immunize a hospital physician who assists a patient at the hospital during a medical emergency. We hold that it cannot.

I

In July 1994, Charmaine and Jose Velazquez (collectively, plaintiffs), individually and as representatives of the estate of their deceased son, Conor, sued St. Peter's Medical Center (Medical Center) and its staff members, Teresa Jiminez, M.D., Angela C. Ranzini, M.D., Ellen Maak, R.N., Jeanine Healy, R.N., and unnamed residents, for damages resulting from their negligence during Conor's delivery.

Before trial, Dr. Jiminez, the Medical Center and the nurses settled with plaintiffs who, in turn, voluntarily dismissed the residents. Dr. Ranzini moved for summary judgment under the Good Samaritan Act, *N.J.S.A.* 2A:62A–1 to –2. The trial court denied the motion as a matter of law, holding that the Act does not immunize physicians responding to emergencies within a hospital. Dr. Ranzini went to trial alone.

The facts established at trial are detailed in the Appellate Division opinion, *Velazquez v. Jiminez,* 336 *N.J.Super.* 10, 18–28, 763 *A.*2d 753 (2000), and are incorporated as if more fully set forth. Mrs. Velazquez was a patient at the Medical Center for the purpose of delivering a baby. Dr. Jiminez was her attending physician. Complications occurred during the delivery because Mrs. Velazquez's baby was suffering from bilateral shoulder dystocia (both of his shoulders were lodged against his mother's pubic bone). After delivering the baby's head, Dr. Jiminez was unable to deliver the rest of the baby's body. She rang for assistance and Dr. Ranzini responded.

Dr. Ranzini had no prior relationship with or connection to Mrs. Velazquez. Dr. Ranzini was an Assistant Professor of Clinical Obstetrics and Gynecology at the University of Medicine and Dentistry of New Jersey (UMDNJ), assigned to the Maternal Fetal Care Unit (MFCU) at the Medical Center. She specializes in maternal fetal medicine and was responsible both for attending to high-risk patients in the MFCU and for supervising resident physicians who cared for their own UMDNJ clinical patients at the Medical Center. Mrs. Velazquez was neither an MFCU nor a clinical patient. Rather, she was the patient of Dr. Jiminez, an attending physician with staff privileges at the Medical Center.

Dr. Ranzini first attempted to complete the delivery vaginally. When those efforts proved unsuccessful, Dr. Ranzini assisted in preparing Mrs. Velazquez and the baby—who was, by virtue of his position, at risk of suffering from hypoxia (a loss of oxygen)—for an emergency Caesarean section. The baby, Conor, ultimately

was born severely brain damaged, spent his life in a dependent state and died of pneumonia before reaching his third birthday.

As might be expected in a medical malpractice case, the trial essentially was a battle of experts. Plaintiffs' experts testified that Dr. Ranzini deviated from the standard of care. Dr. Ranzini's experts testified, in essence, that her conduct conformed to all applicable medical standards and that Conor's condition resulted from the negligence of Dr. Jiminez. The details of that testimony need not be recounted here because the issue before us is Dr. Ranzini's amenability to suit and not the substance of the care that she rendered.

The jury returned a verdict in favor of plaintiffs and assigned three percent of the liability to Dr. Ranzini. The trial court, *sua sponte*, entered judgment notwithstanding the verdict (j.n.o.v.) in favor of Dr. Ranzini. The court ruled that under *Scafidi v. Seiler*, 119 *N.J.* 93, 574 *A.*2d 398 (1990), Dr. Ranzini's liability could not be regarded as a substantial factor in the harm that resulted to Conor. In so ruling, the court reiterated that the Good Samaritan Act did not operate to insulate Dr. Ranzini from suit.

Plaintiffs appealed, challenging the j.n.o.v., among other trial errors. Dr. Ranzini cross-appealed from the trial court's ruling that the Good Samaritan Act did not immunize her from suit. The Appellate Division reversed the j.n.o.v. (an issue not before us) and rejected Dr. Ranzini's cross-appeal on the ground that, as a matter of law, the Good Samaritan Act does not apply to physicians working within a hospital. *Velazquez, supra,* 336 *N.J.Super.* at 16, 52, 763 *A.*2d 753.

We granted Dr. Ranzini's petition for certification regarding the applicability of the Good Samaritan Act to emergencies involving a patient occurring within a hospital. 169 *N.J.* 604, 782 *A.*2d 422 (2001).

II

Dr. Ranzini argues that the Appellate Division erred in concluding that the protections of the Good Samaritan statute stop at the

door of the hospital. According to her, the location of an emergency is of no consequence; a physician is immunized so long as he or she acts in the absence of a prior duty to do so. She further contends that the weight of out-of-state authority supports her interpretation, which she claims will encourage physicians to assist in a hospital emergency. Finally, she argues that she had no prior duty to Mrs. Velazquez and thus was entitled to the shield of *N.J.S.A.* 2A:62A–1 as a volunteer.

Plaintiffs counter that Dr. Ranzini's construction of the Act is inconsistent with its plain meaning and legislative purpose. They contend that it would be illogical for the Legislature to have intended the original "scene of an accident or emergency" language to include care rendered in a hospital if, in 1987, it conferred an additional grant of immunity to Good Samaritans while they transport victims *from* the scene *to* the hospital. Plaintiffs additionally dispute that most other jurisdictions have immunized physicians in hospitals. Finally, plaintiffs assert that Dr. Ranzini had a pre-existing duty to assist Mrs. Velazquez.

### III

The term "Good Samaritan" derives from a New Testament parable in which a Samaritan was the only passer-by to aid a man who had been left half dead by a group of thieves. *Luke* 10:30–37 (King James).[1] Although the Good Samaritan is viewed as a

---

[1] That parable states:

A certain man went down to Jerusalem to Jericho, and fell among thieves which stripped him of his raiment, and wounded him, and departed, leaving him half dead. And by chance there came down a certain priest that way: and when he saw him, he passed by on the other side. And likewise a Levite, when he was at the place, came and looked at him, and passed by on the other side. But a certain Samaritan, as he journeyed, came where he was: and when he saw him, he had compassion on him, and went to him, and bound up his wounds, pouring in oil and wine, and set him on his own beast, and brought him to an inn, and took care of him. And on the morrow when he departed, he took out two pence, and gave them to the host and said unto him, Take care of him; and whatsoever thou spendest more, when

behavioral model, the common law devolved no duty on a bystander to provide affirmative aid to an injured person, even if he or she had the ability to do so. *Lundy v. Adamar of New Jersey, Inc.,* 34 *F.*3d 1173, 1178 (3d Cir.1994) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 56, at 375 (5th ed.1984)); *see also Malloy v. Fong,* 37 *Cal.*2d 356, 232 *P.*2d 241, 247 (1951) ("[N]o one is obliged by law to assist a stranger, even though he can do so by a mere word, and without the slightest danger to himself.") (alteration in original) (quoting *Silva v. Providence Hosp.,* 14 *Cal.*2d 762, 97 *P.*2d 798, 804 (1939)); *Hurley v. Eddingfield,* 156 *Ind.* 416, 59 *N.E.* 1058, 1058 (1901) (holding that only physician available in town not liable for refusing request to come to assist seriously ill person who subsequently died from lack of medical attention). However, once a bystander endeavored to help, the common law recognized a duty to do so reasonably, and the volunteer could be held liable for injuries caused by his or her negligent assistance. *Malloy, supra,* 232 *P.*2d at 247; *cf. United States v. DeVane,* 306 *F.*2d 182, 186 (5th Cir.1962) (holding that Coast Guard's decision to undertake or abandon rescue is discretionary, "[b]ut having undertaken the rescue and engendering reliance thereon, the obligation arose to use reasonable care in carrying out the rescue"). Dean Prosser aptly summarized the common law: "The result of all this is that the Good Samaritan who tries to help may find himself mulcted in damages, while the priest and the Levite who pass by on the other side go on their cheerful way rejoicing." William L. Prosser, *Handbook of the Law of Torts* § 56, at 341–42 (4th ed.1971).

In fact, however, prior to 1959, "there could be found no instance, in California or any other state, of a physician being sued for negligence in rendering aid at the scene of an emergency." Frank B. Mapel, III & Charles J. Weigel, II, *Good Samaritan*

I come again, I will repay thee. Which of these three, thinkest thou, was neighbour unto him that fell among the thieves. And he said, He that shewed mercy on him. Then said Jesus unto him, Go, do thou likewise. [*Luke* 10:30–37 (King James).]

*Laws—Who Needs Them?: The Current State of Good Samaritan Protection in the United States,* 21 *S. Tex. L.Rev.* 327, 330 (1981) (citing Chayet, *This Summer in Samaria, Emergency Med.,* June 1971, at 161–64); *accord* Stewart R. Reuter, M.D., J.D., *Physicians as Good Samaritans, Should They Receive Immunity for their Negligence When Responding to Hospital Emergencies?,* 20 *J. Legal Med.* 157, 164 (1999) ("[A]ppellate court cases in which physicians have been sued for providing negligent, or even grossly negligent, emergency care at roadside accidents are nonexistent.").

Nevertheless, in 1959, California became the first state to adopt a Good Samaritan statute immunizing from tort liability a physician who "in good faith renders emergency care at the scene of the emergency." Mapel & Weigel, *supra,* 21 *S. Tex. L.Rev.* at 329 (quoting *A.B.* 2873, *Cal. Stats.* 1959, ch. 1507 (current version at *Cal. Bus. & Prof.Code* § 2395)). An early California decision explained the rationale underpinning Good Samaritan legislation:

[The statutes] were enacted to aid the class of individuals though requiring immediate medical care were not receiving it. Typically, it was the roadside accident victim who, as a result of the strictures of the common law malpractice doctrines, was left uncared for. However, hospital patients, such as the decedent[,] have historically enjoyed the benefits of full medical attention. There is no need for special legislation to encourage physicians to treat this class of individuals.

. . . .

[The Good Samaritan] sections were directed towards physicians who, by chance and on an irregular basis, come upon or are called to render emergency medical care. Often, under these circumstances, the medical needs of the individual would not be matched by the expertise of the physician and facilities could be severely limited . . . .

[*Colby v. Schwartz,* 78 *Cal.App.*3d 885, 892, 144 *Cal.Rptr.* 624, 628 (Cal.Ct.App. 1978).]

Every scholar who has studied the subject agrees with that circumscribed description of the goals underlying Good Samaritan legislation. Reuter, *supra,* 20 *J. Legal Med.* at 189 (noting "the difficulty that confronts the physician who stops at the site of a roadside accident, who can provide little more than first-aid until the EMS team arrives"); Jennifer L. Groninger, Comment, *No Duty to Rescue: Can Americans Really Leave a Victim Lying in the Street? What is Left of the American Rule, and Will it*

*Survive Unabated?*, 26 *Pepp. L.Rev.* 353, 364 (1999) (noting that Good Samaritan laws were enacted to encourage volunteerism of medical personnel who "find themselves in rescue situations without proper equipment or sanitation") (footnote omitted); Bridget A. Burke, *Using Good Samaritan Acts to Provide Access to Health Care for the Poor: A Modest Proposal*, 1 *Annals Health L.* 139, 140 (1992) ("These statutes were a result of legislators' perceptions that highway accident victims would be ignored by potential rescuers because of the rescuers' concerns about liability."); James W. Dyke, Jr., Note, *The Duty to Aid One in Peril Good Samaritan Laws*, 15 *How. L.J.* 672, 676 (1969) ("[T]hese statutes attempt to regulate [situations] where ... there is no medical or police help present to administer aid during the vital first few moments."); Note, *Good Samaritans and Liability for Medical Malpractice*, 64 *Colum. L.Rev.* 1301, 1307 (1964) ("In a rescue operation, ... the problem of proper treatment is aggravated by the absence of adequate facilities and equipment. Thus, in circumstances calling for urgent assistance, the doctor is especially reluctant to volunteer medical services and assume the substantial risk of malpractice liability.").

■ In sum, Good Samaritan legislation has, at its core, the goal of encouraging the rendering of medical care to those who need it but otherwise might not receive it (ordinarily roadside accident victims), by persons who come upon such victims by chance, without the accoutrements provided in a medical facility, including expertise, assistance, sanitation or equipment.

IV

All fifty states and the District of Columbia have now enacted some form of Good Samaritan legislation. As of 1987, "117 statutes provide[d] varying degrees of immunity to different classes of rescuers under a multitude of settings." Reuter, *supra*, 20 *J. Legal Med.* at 157 (quoting Robert A. Mason, *Good Samaritan Laws—Legal Disarray: An Update*, 38 *Mercer L.Rev.* 1439, 1442 (1987)). Moreover, "no two states are alike. This is in part due to disparate policies behind their enactment and in part

because of the ambiguous terminology used in their manufacture." Mapel & Weigel, *supra,* 21 *S. Tex. L.Rev.* at 331 (footnote omitted). *See also* Eric A. Brandt, Comment, *Good Samaritan Laws—The Legal Placebo: A Current Analysis,* 17 *Akron L. Rev.* 303, 304 (1983) ("[M]any of the 109 Good Samaritan statutes effective today are so confusing and ambiguous that the people whom they are meant to protect either do not know that they are covered under a particular statute or cannot understand the extent of their protection.") (footnotes omitted). The country's Good Samaritan statutes broadly can be classified as falling into one of three categories: those that expressly exclude hospital care; those that expressly include hospital care; and those, like New Jersey's, that contain no explicit provision one way or the other.

Currently, eleven jurisdictions unequivocally exclude from statutory immunity emergency care rendered to patients within a hospital or other health care facility. Examples include *D.C.Code Ann.* § 7–401(a) (2001) (encompassing care rendered "at the scene of an accident or other emergency in the District of Columbia *outside of a hospital*") (emphasis added); and *N.Y. Educ. Law* § 6527(2) (McKinney 2001) (referring to care rendered "at the scene of an accident or other emergency, *outside a hospital, doctor's office or any other place having proper and necessary medical equipment*") (emphasis added).[2]

Conversely, Good Samaritan statutes in seven jurisdictions immunize emergency care provided in a hospital setting.[3] *Alaska*

---

[2] The remaining statutes expressly excluding in-hospital care are: *Fla. Stat. Ann.* § 768.13(2)(a) (West Supp.2002); *Ind.Code Ann.* § 34–30–12–1(a) (Michie Supp.2001); *Ky.Rev.Stat. Ann.* § 411.148(1) (Banks–Baldwin 2001); *Me.Rev.Stat. Ann.* tit. 14, § 164 (West 1980); *Minn.Stat. Ann.* § 604A.01(2)(b) (West 2002); *Ohio Rev.Code Ann.* § 2305.23 (Anderson 2001); *Or.Rev.Stat.* § 30.800(1)(a) (2001); *R.I. Gen. Laws* § 5–37–14 (1999); *Wis. Stat. Ann.* § 895.48(1) (West Supp.2001).

[3] When first enacted, five of those statutes contained general language like our own: 1971 *Alaska Sess. Laws* ch. 119, § 1 (immunizing volunteer who "renders

*Stat.* § 09.65.090(a) (Michie 2000) (immunizing "[a] person *at a hospital* or any other location who renders emergency care") (emphasis added); *Cal. Bus. & Prof.Code* § 2395 (West 1990) (" 'The scene of an emergency' ... *shall include, but not be limited to, the emergency rooms of hospitals* in the event of a medical disaster.") (emphasis added); *Colo.Rev.Stat. Ann.* § 13–21–108(1) (West 1997) (immunizing physician providing "emergency care ... to a person not presently his patient ... at the place of an emergency or accident, *including a health care institution* ") (emphasis added); *Idaho Code* § 39–1391c (1998) ("[N]o physician [furnishing emergency medical care and treatment] nor any hospital where such care and treatment is provided shall be held liable ...."); *La.Rev.Stat. Ann.* § 37:1731A(2)(a) (West 2000) (including physician responses *"within the hospital or facility"* ) (emphasis added); *Mich. Comp. Laws* § 691.1502 (2001) (extending immunity to assistance rendered *"within a hospital* or other licensed medical care facility") (emphasis added); *Tex. Civ. Prac. & Rem. Code Ann.* § 74.001(c) (West Supp.2002) (providing immunity *"in*

care to an injured or sick person, ... who appears to be in immediate need of aid" without specifying location of care) (amended by 1976 *Alaska Sess. Laws* ch. 102, § 38, to provide immunity to persons rendering emergency care "at a hospital or any other location") (codified at *Alaska Stat.* § 09.65.090(a)); 1959 *Cal. Stat.* 1507, § 1 (immunizing care rendered "at the scene of the emergency") (codified as amended in *Cal. Bus. & Prof.Code* § 2144) (amended by 1976 *Cal. Stats.* 824, § 1 to provide that " 'scene of an emergency' as used in this section shall include, but not be limited to, the emergency rooms of hospitals in the event of a medical disaster") (current version at *Cal. Bus. & Prof.Code* § 2395 (West 1990)); *Colo.Rev.Stat. Ann.* § 13–21–108(1) (immunizing "emergency care or assistance without compensation at the place of an emergency or accident") (amended by 1990 *Colo. Laws, H.B.* 90–1065 to extend immunity to care rendered "at the place of an emergency or accident, including a health care institution"); *Mich. Comp. Laws Ann.* § 691.1501 (immunizing "emergency care at the scene of an emergency") (extended by 1975 *Mich. Pub. Acts* 123, § 1, to include care rendered "within a hospital or other licensed medical care facility") (codified at *Mich. Comp. Laws* § 691.1502; and 1961 *Tex. Gen. Laws* ch. 317, § 1, p. 618 (immunizing care rendered "at the scene of an emergency") (amended by 1977 *Tex. Gen. Laws* ch. 817, § 21.02, p. 2054, to extend immunity to care rendered "at the scene of an emergency or in a hospital") (current version at *Tex. Civ. Prac. & Rem.Code Ann.* § 74.001(c) (West Supp.2002)).

*a hospital*" to non-emergency room physician that is neither "an admitting or attending physician of the patient" nor "a treating physician associated by the admitting or attending physician").[4]

New Jersey is among twenty-nine states whose statutes fall within the third major category and contain general language that does not explicitly address whether in-hospital care can be shielded from liability under a Good Samaritan statute. By way of example, some statutes in that class immunize care provided "at the scene of an accident or emergency to the victim or victims thereof," *Ga.Code Ann.* § 51-1-29 (2000); *N.J.S.A.* 2A:62A-1.1; "at the scene of the emergency," *Del.Code Ann.* tit. 24, § 1767 (1997); "at the scene of an accident, fire, or any life-threatening emergency," *Va.Code Ann.* § 8.01-225(A)(1) (Michie 2000); or "at the scene of an accident, casualty, or disaster." *Ala.Code* § 6-5-332(a) (Michie Supp.2001). Pennsylvania's statute is more detailed and provides immunity to

> [a]ny physician or any other practitioner of the healing arts or any registered nurse, licensed by any state, *who happens by chance upon the scene* of an emergency *or who arrives on the scene* of an emergency *by reason of serving on an emergency call panel* or similar committee of a county medical society *or who is called to the scene of an emergency by the police* or other duly constituted officers of a government unit *or who is present when an emergency occurs* and who, in good faith, renders emergency care at the scene of the emergency . . . .
>
> [42 *Pa. Cons.Stat. Ann.* § 8331(a) (West 1998) (emphasis added).]

To qualify for immunity under Pennsylvania's statute, the Good Samaritan must hold "a reasonable opinion that the immediacy of the situation is such that the *rendering of care should not be postponed until the patient is hospitalized.*" *Id.* § 8331(b) (emphasis added). One statute explicitly extends coverage to emergency care given "wherever required." *Okla. Stat. Ann.* tit. 76, § 5(a)(1) (West 2002). Others simply immunize "emergency medi-

---

[4] Four enactments, although denominated as Good Samaritan statutes that apply in hospitals, do not provide immunity at all; Good Samaritans in those states are subjected to liability for ordinary negligence. *Ark.Code Ann.* § 17-95-101(a) (Michie 2002); *Haw.Rev.Stat.* § 663-1.5(c) (Michie Supp.2001); *Kan. Stat. Ann.* § 65-2891(c) & (d) (1992); *Miss.Code Ann.* § 73-25-37(1) (Supp. 2001).

cal or professional assistance to a person in need thereof," *Conn. Gen.Stat.* § 52–557b(a) (West Supp.2002); "emergency care without fee" provided "in good faith," 745 *Ill. Comp. Stat. Ann.* 49/25 (West Supp.2002); "emergency care or assistance in an emergency," *Nev.Rev.Stat.* § 41.500(1) (2001); or "aid or assistance necessary or helpful in the circumstances to other persons who have been injured or are ill as the result of an accident or illness, or ... trauma," *N.D. Cent.Code* § 32–03.1–01 (1996), without mentioning any geographic limitations.[5]

Of the twenty-nine states with general statutes like New Jersey's, five have enacted additional specific immunity provisions applicable to emergency obstetrical care. Those statutes include *Ariz.Rev.Stat. Ann.* § 32–1473 (West Supp.2001) (applying enhanced "clear and convincing" burden of proof in malpractice actions against health care facility and physicians providing emergency treatment during labor and delivery who have not previously treated patient); *Mont.Code Ann.* § 27–1–734 (2001) (immunizing hospital, nurse or physician rendering "emergency obstetrical care" to "a patient of a direct-entry midwife in an emergency situation"); *Nev.Rev.Stat.* § 41.505(3) (2001) (immunizing medical facility and physician who has not previously treated patient and who in good faith "renders emergency obstetrical care or assistance to a pregnant woman during labor or the delivery of the child" where injuries are primarily caused by lack of prenatal care); *N.D. Cent.Code* § 32–03.1–02.1 (1996) (immunizing physician who "renders emergency obstetrical care or assistance to a

---

[5] The remaining general language statutes are: *Ariz.Rev.Stat.* § 32–1471 (West 1992); *Iowa Code* § 613.17 (West 1999); *Md.Code Ann., Cts. & Jud. Proc.* § 5–603 (1998); *Mass. Gen. Laws Ann.* ch. 112, § 12B (West 1996); *Mo. Ann. Stat.* § 537.037 (West 2000); *Mont.Code Ann.* § 27–1–714 (2001); *Neb.Rev.Stat. Ann.* § 25–21,186 (Michie 1995); *N.H.Rev.Stat. Ann.* § 329:25 (1995); *N.M. Stat. Ann.* § 24–10–3 (Michie 2000); *N.C. Gen.Stat.* § 90–21.14 (2001); *S.C.Code Ann.* § 15–1–310 (Law.Co-op.1977); *S.D. Codified Laws* § 20–9–3 (Michie 1995); *Tenn.Code Ann.* § 63–6–218(b)(1) (Supp.2001); *Utah Code Ann.* § 58–13–2 (Supp.2001); *Vt. Stat. Ann.* tit. 12, § 519 (1973); *Wash. Rev.Code Ann.* § 4.24.300 (West 1988); *W. Va.Code* § 55–7–15 (2000); *Wyo. Stat. Ann.* § 1–1–120(a) (Michie 2001).

pregnant female in active labor who has not previously been cared for in connection with the pregnancy by the physician"); *Va. Code Ann.* § 8.01–225(A)(2) (Michie 2000) (immunizing "any person" who "renders emergency obstetrical care or assistance to a female in active labor who has not previously been cared for in connection with the pregnancy by such person"). None of those statutes expressly excludes obstetrical care provided within a hospital; in fact, most assume that such care is provided within a medical facility.

Finally, some general-language jurisdictions (including New Jersey) provide express immunity for medical care rendered while transporting an injured person from "the scene" to a hospital. *See, e.g., Iowa Code* § 613.17 (West 1999) ("at the place of an emergency or accident or while the person is in transit to or from the emergency or accident"); *N.D. Cent. Code* § 39–08–04.1 (1997) ("en route [from the scene of an accident, disaster, or other emergency] to a treatment facility"); *Va. Code Ann.* § 8.01–225(A)(1) ("en route therefrom [from the scene of an accident, fire or any life-threatening emergency] to any hospital, medical clinic or doctor's office"); *Wash. Rev. Code Ann.* § 4.24.300 (West 1988) ("in transporting, not for compensation, therefrom [from the scene of an emergency] an injured person or persons for emergency medical treatment").

In 1996 and 1998, our Legislature added two new Good Samaritan provisions specifically protecting law enforcement officers and firefighters, respectively. *N.J.S.A.* 2A:62A–1.1 and –1.2. Each of those sections immunizes good faith emergency care given "at the scene of an accident or emergency to any victim thereof, or in transporting any such victim *to a hospital* or other facility where treatment is to be rendered[.]" *Ibid.* (emphasis added).

The few judicial decisions interpreting the category of statutes that neither expressly excludes nor expressly includes in-hospital emergency medical care are in equipoise. On the one hand, cases from Arizona, Indiana and Oklahoma support the proposition that Good Samaritan statutes do not immunize emergency care provid-

ed in a hospital to a patient. *Guerrero v. Copper Queen Hosp.*, 112 *Ariz.* 104, 537 *P.*2d 1329, 1331 (1975); *Steffey v. King*, 614 *N.E.*2d 615, 617 (Ind.Ct.App.1993); *Jackson v. Mercy Health Ctr., Inc.*, 864 *P.*2d 839, 844 (Okla.1993). On the other, courts in Georgia, Illinois, and Utah have interpreted their state's Good Samaritan statutes as protecting physicians who render emergency medical care in a hospital setting. *Clayton v. Kelly*, 183 *Ga.App.* 45, 357 *S.E.*2d 865, 868 (1987); *Johnson v. Matviuw*, 176 *Ill.App.*3d 907, 126 *Ill.Dec.* 343, 531 *N.E.*2d 970, 972, 975–76 (1988), *appeal denied*, 125 *Ill.*2d 566, 130 *Ill.Dec.* 481, 537 *N.E.*2d 810 (1989); *Hirpa v. IHC Hosps., Inc.*, 948 *P.*2d 785, 788 (Utah 1997). The difference in outcome between the cases is based, in great measure, on whether the statutes were broadly or narrowly interpreted.

In any event, it would be fair to say that there is no universal interpretation of general statutory language among our sister jurisdictions, no roadmap to follow. Thus, to the extent that the parties in this case rely on the weight of out-of-state authority in support of their positions, they have vastly overstated the case.

V

In interpreting a legislative enactment, the starting point is the language of the statute itself. If the language is clear, " ' "the sole function of the courts is to enforce it according to its terms.' " *Hubbard ex rel. Hubbard v. Reed*, 168 *N.J.* 387, 392, 774 *A.*2d 495 (2001) (quoting *Sheeran v. Nationwide Mut. Ins. Co.*, 80 *N.J.* 548, 556, 404 *A.*2d 625 (1979) (quoting *Caminetti v. United States*, 242 *U.S.* 470, 485, 37 *S.Ct.* 192, 194, 61 *L.Ed.* 442, 452 (1917))). All terms in a statute should be accorded their normal sense and significance. *Stryker Corp. v. Director, Div. of Taxation*, 168 *N.J.* 138, 156, 773 *A.*2d 674 (2001). When a statute is subject to more than one plausible reading, our role is "to effectuate the legislative intent in light of the language used and the objects sought to be achieved." *State v. Hoffman*, 149 *N.J.* 564, 578, 695 *A.*2d 236 (1997) (internal citations omitted).

 Primary regard must be given to the fundamental purposes for which the legislation was enacted. " 'When all is said and done, the matter of statutory construction ... will not justly turn on literalisms, technisms, or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation.' " *LaFage v. Jani,* 166 *N.J.* 412, 431, 766 *A.*2d 1066 (2001) (alteration in original) (quoting *Jersey City Chap. Prop. Owner's Protective Ass'n v. City Council,* 55 *N.J.* 86, 100, 259 *A.*2d 698 (1969)).

 Further, a statute enacted in derogation of the common law must be construed narrowly. *Oswin v. Shaw,* 129 *N.J.* 290, 310, 609 *A.*2d 415 (1992). Where a statute alters the common law, the most circumscribed reading of it that achieves its purpose is the one that should be adopted. Doubt about its meaning should be resolved in favor of

> the effect which makes the least rather than the most change in the common law. The rule has been declared by the United States Supreme Court, as follows: "No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express."
>
> [*Ibid.* (quoting 3 Norman J. Singer, *Sutherland Statutory Construction* § 61.01, at 77 (4th ed.1986) (footnote omitted) (quoting *Shaw v. Railroad Co.,* 101 *U.S.* 557, 565, 25 *L.Ed.* 892, 894 (1880))).]

Coincident with that interpretive canon is our tradition of giving "narrow range" to statutes granting immunity from tort liability because they leave "unredressed injury and loss resulting from wrongful conduct." *Harrison v. Middlesex Water Co.,* 80 *N.J.* 391, 401, 403 *A.*2d 910 (1979) (construing strictly landowner's immunity statute). *See also Renz v. Penn Cent. Corp.,* 87 *N.J.* 437, 457–58, 435 *A.*2d 540 (1981) (holding that railroad immunity act should be strictly construed); *Immer v. Risko,* 56 *N.J.* 482, 487–88, 267 *A.*2d 481 (1970) (construing strictly marital immunity statute); *cf. Hallacker v. National Bank & Trust Co.,* 806 *F.*2d 488, 490–93 (3d Cir.1986) (construing strictly New Jersey Landowner's Liability Act).

With those general principles in mind, we look now to our Good Samaritan statute, enacted· in 1963, following California's lead.

Originally, the statute included only health care practitioners; it was amended in 1968 to extend immunity to "any individual," including a person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof. . . .

[*N.J.S.A.* 2A:62A–1.]

Thus, in derogation of the basic common law principle that one who volunteers to render assistance must do so reasonably, anyone who rendered care at the scene of an accident or emergency was immunized from civil liability.

Although the statute in its original form was silent regarding whether "the scene of an accident or emergency" is limited in any way, it was most recently amended to "clarify" that volunteer members of a first aid or ambulance squad are granted *"the same immunity"* as all other individuals. Assembly Law, Public Safety, Defense & Corrections Committee Statement accompanying Bill No. 2467—*L.* 1987, *c.* 296 (emphasis added). In its present form, the statute immunizes any Good Samaritan who "renders emergency care at the scene of an accident or emergency to the victim or victims thereof, or while transporting the victim or victims thereof to a hospital or other facility where treatment or care is to be rendered." *N.J.S.A.* 2A:62A–1.

The Appellate Division read that new language as revelatory of a legislative understanding that "the scene of an accident or emergency" is somewhere other than a hospital or treatment facility, which is staffed and equipped to render medical care. *Velazquez, supra,* 336 *N.J.Super.* at 48, 763 *A.*2d 753. That is certainly one fair interpretation of the statute, which scholars have approved. "By distinguishing between these two types of places, the legislature operationally defined 'scene of an emergency' as a place other than a hospital. . . ." Roger L. Tuttle, *Hospital Emergency Rooms—Application of Good Samaritan Laws,* 31 *Med. Trial Tech. Q.* 145, 157 (Fred Lane ed., 1985) (discussing *Miss. Code Ann.* § 73–25–37). More fundamental to us is the notion that if the Legislature had intended the locationally unlimited

immunity urged by Dr. Ranzini, it simply could have said so. *See, e.g., Okla. Stat. Ann.* tit. 76, § 5(a)(1) (immunizing medical practitioner who "voluntarily and without compensation, renders or attempts to render emergency care to an injured person or any person who is in need of immediate medical aid, *wherever required*") (emphasis added). There would have been no reason for it to include, at the Act's inception, the limiting language "at the scene of an accident or emergency." There likewise would have been no subsequent need to extend immunity explicitly to persons rendering emergency care while transporting a victim to a medical facility. All of those circumstances would have been encompassed by a statute that immunized anyone rendering emergency medical care. The Legislature apparently intended a circumscription of Good Samaritan immunity as evidenced by the limiting language it chose.

That narrowly tailored interpretation does the least violence to our citizens' common-law right to institute tort actions against those whose negligence injures them. It thus conforms to our rules regarding the interpretation of statutes in derogation of the common law and statutes granting immunity. Moreover, it gives full throat to the goals underlying the legislation: to encourage the rendering of medical care to those who would not otherwise receive it, by physicians who come upon such patients by chance, without the benefit of the expertise, assistance, equipment or sanitation that is available in a hospital or medical setting. *Colby v. Schwartz, supra,* 78 *Cal.App.*3d at 892, 144 *Cal.Rptr.* at 628; Reuter, *supra,* 20 *J. Legal Med.* at 189; Groninger, *supra,* 26 *Pepp. L.Rev.* at 364; Burke, *supra,* 1 *Annals Health L.* at 140; Dyke, *supra,* 15 *How. L.J.* at 676; Note, *supra,* 64 *Colum. L.Rev.* at 1307.

Obviously, in enacting our Good Samaritan law, the Legislature was aware that a hospital patient is present in that venue for the very purpose of receiving medical care and is not a person who ordinarily would lack care in the absence of Good Samaritan immunity. Further, physicians in a hospital ordinarily do not come

upon a hospital patient "by chance" as would be the case if an accident or emergency occurred on a roadway. Most importantly, our Legislature knew that the fundamental problem facing a Good Samaritan on the street (the ability to do little more than render first aid under less than optimal circumstances) is not present in a fully staffed and equipped facility like a hospital, whose very purpose is "to make available[ ] the human skill and physical materiel of medical science to the end that the patient's health be restored." *Perlmutter v. Beth David Hospital,* 308 *N.Y.* 100, 123 *N.E.*2d 792, 794 (1954). As Stewart R. Reuter has observed in "Physicians as Good Samaritans," 20 *J. Legal Med.* 157, 189 (1999):

> [P]hysicians who care for patients in hospitals are not volunteers in the sense of the person who by chance comes upon the scene of an accident. Moreover, physicians who provide emergency care in hospitals have at their disposal all the modern diagnostic and therapeutic equipment. Granted, they may not be familiar with the patient's medical history or disease and are at somewhat of a disadvantage when compared with the patient's personal physician. However, this disadvantage does not rise to the level of the difficulty that confronts the physician who stops at the site of a roadside accident, who can provide little more than first-aid until the EMS team arrives. In many cases, the physician or surgeon whose expertise is being requested in a hospital emergency will work with a physician or with hospital personnel who have excellent knowledge of the patient's condition and problems. Even if no other physician is already involved in the emergency, the duration of care provided generally is short—until the hospital's trained Code Blue team arrives.

*See also* Theodore Flowers & William J. Kennedy, Note, *Good Samaritan Legislation: An Analysis and a Proposal,* 38 *Temp. L.Q.* 418, 425 (1965) (suggesting that Good Samaritan immunity be limited to places other than hospital or physician's office to "confine protection to those situations where it is needed most; where neither proper equipment nor adequate facilities are available"). In other words, the "scene of an accident or emergency" reasonably should be understood to incorporate only those locations at which the provision of adequate and necessary medical care is compromised by the existing conditions.

■ Dr. Ranzini's suggestion that she qualifies as a Good Samaritan because she had no prior duty to Mrs. Velazquez misconceives the Good Samaritan Act entirely. Although the

absence of a pre-existing duty is one element that volunteers must establish to qualify for Good Samaritan immunity, *Praet v. Borough of Sayreville,* 218 *N.J.Super.* 218, 223, 527 *A.*2d 486 (App. Div.), *certif. denied,* 108 *N.J.* 681, 532 *A.*2d 253 (1987), standing alone it does not satisfy the statute. It is the reduced circumstances in which the volunteer finds himself or herself that the Legislature recognized, and it is the rendering of care in the face of those restrictions that it desired to immunize from suit. Had the Legislature intended to insulate *anyone* rendering emergency care under *any circumstances* where no pre-existing duty to render aid exists, it could have done so simply and directly. *See, e.g., Conn. Gen.Stat.* § 52–557b(a) (West Supp.2002) (immunizing medical practitioner "who, voluntarily and gratuitously and other than in the ordinary course of such person's employment or practice, renders emergency medical or professional assistance to a person in need thereof"); *Nev.Rev.Stat.* § 41.500(1) (2001) (immunizing "any person in this state who renders emergency care or assistance in an emergency, gratuitously and in good faith").

We think it is important as well that five out of the seven state statutes that now expressly immunize emergency care in a hospital setting contained, at their inception, general language like ours. *Supra* at 251 n. 3, 798 *A.*2d at 58 n. 3. Likewise, the legislatures in states that have immunized obstetrical care rendered in a hospital have done so with a specific enactment, altering or supplementing a general statute like our own. *Supra* at 254–55, 798 *A.*2d at 60. Presumably, the legislatures of those states recognized that in-hospital emergency care is not within the contemplation of a general language Good Samaritan act. Karen H. Rothenberg, *Who Cares?: The Evolution of the Legal Duty to Provide Emergency Care,* 26 *Hous. L.Rev.* 21, 72 (1989) (noting that Virginia emergency obstetrical care provision, adopted after general statute, was enacted in response to obstetricians' threats to boycott on-call emergency room services).

Dr. Ranzini's contention that by not extending Good Samaritan immunity to a hospital we will encourage physicians to simply stand by and allow patients to suffer or die is equally unpersuasive. First, we will not impute such conduct to the highly respected medical profession. Moreover, we note that scholars suggest that physicians' contracts, hospital protocols, ethical rules, regulatory standards and physicians' personal relationships operate to make that potential extremely unrealistic relative to a hospital patient. Reuter, *supra,* 20 *J. Leg. Med.* at 187, 189. To be sure, the Legislature is free to immunize all persons who render emergency medical treatment without a prior duty to do so, including those who volunteer to act within the walls of a hospital. We tilt neither against nor in favor of such an extension of immunity. We simply are persuaded that the choice is one for the Legislature, and we are unconvinced that the current statute reflects a legislative choice in favor of such immunity.

In sum, Good Samaritan immunity under *N.J.S.A.* 2A:62A-1 encompasses only those situations in which a physician (or other volunteer) comes, by chance, upon a victim who requires immediate emergency medical care, at a location compromised by lack of adequate facilities, equipment, expertise, sanitation and staff. A hospital or medical center does not qualify under the terms of the Good Samaritan Act in its present form.

## VI

One final note. It is important to recognize that it simply does not follow that because a party is amenable to suit, he or she will be liable. The Good Samaritan Act renders a very circumscribed population of emergency volunteers immune from suit. The remainder of our citizens are subject to the ordinary common law rules governing conduct. Thus, for example, if a party has a pre-existing duty to act and breaches it, either by failing to act or performing in a negligent manner, the breach will be actionable. *Restatement (Second) of Torts,* Division Two, Ch. 12, Topic 4, Scope Note, at 65–66 (1965). In the absence of a pre-

existing legal duty, if a party undertakes to act and does so in an unreasonable manner, that conduct will be actionable. *Dawson v. Bunker Hill Plaza Assocs.*, 289 *N.J.Super.* 309, 327, 673 *A.*2d 847 (App.Div.), *certif. denied*, 146 *N.J.* 569, 683 *A.*2d 1164 (1996); *O'Neill v. Suburban Terrace Apartments, Inc.*, 110 *N.J.Super.* 541, 545, 266 *A.*2d 304 (App.Div.), *certif. denied*, 57 *N.J.* 138, 270 *A.*2d 40 (1970). Whether a volunteer's conduct is reasonable depends upon the circumstances, including his or her experience and training. The standard of care to be imposed "will vary with . . . the level of skill of the individual," Mapel & Weigel, *supra*, 21 *S. Tex. L.Rev.* at 328, and requires "careful consideration of all the attending circumstances, including any disability under which the rescuer might be operating—e.g., physical incapacity as well as the urgency of the situation and the concomitant need to act quickly." Brandt, *supra*, 17 *Akron L.Rev.* at 305 (citing *Restatement (Second) of Torts* §§ 283C, 296(1) (1977)). No party is *required* to volunteer in the absence of a pre-existing duty to do so. *O'Neill, supra*, 110 *N.J.Super.* at 545, 266 *A.*2d 304. The question of duty is one of law to be decided on a case-by-case basis. *Pfenninger v. Hunterdon Cent. Reg'l High School*, 167 *N.J.* 230, 240–41, 770 *A.*2d 1126 (2001); *Wlasiuk v. McElwee*, 334 *N.J.Super.* 661, 666, 760 *A.*2d 829 (App.Div.2000).

The narrow holding here does not affect those common law principles that govern the conduct of professionals in a hospital setting. It merely carries out the Legislature's intention to carve out, from the ordinary rules of tort liability, a class of volunteers that ministers to victims suffering through the first critical moments after an unexpected event such as a roadside motor vehicle accident, a dwelling fire, a gas pump explosion, a heart attack, or premature labor in a location at which facilities, staff, equipment, sanitation or expertise are limited.

## VII

Because Dr. Ranzini rendered aid to Mrs. Velazquez in a fully equipped and staffed hospital to which Mrs. Velazquez had

been admitted for the purpose of receiving medical care, the Good Samaritan Act did not immunize her from suit. When she assisted in Mrs. Velazquez's delivery, our law imposed on her the obligation to do so in accordance with the applicable standard of care. A jury found her to be negligent to a minimal degree. The Appellate Division upheld that judgment and we see no warrant to interfere with it. Thus, we affirm.

VERNIERO, J., dissenting.

The Court concludes that the Good Samaritan Act cannot be invoked to immunize a physician who responds in a hospital setting to an emergent call by another physician to assist the latter physician's patient in crisis. Unlike the majority, I believe that under the statute as written a health-care professional in a hospital who does not otherwise have a duty to act is entitled to the same Good Samaritan protections as any other person. In my view, the proper disposition is to remand this matter to the Law Division to evaluate whether any physician agreements, hospital protocols, or regulations require a broad imposition of a duty in these circumstances.

I accept the majority's impressive historical analysis of Good Samaritan legislation throughout the country. For me, however, that history does not demonstrate convincingly that our Legislature intended the Act to stop at the hospital door. In that respect, I find only two limitations on the reach of the Act, namely, that the aid giving rise to liability must be rendered "at the scene of an accident or emergency" or "while transporting the victim ... to a hospital or other facility[.]" *N.J.S.A.* 2A:62A–1. I would not impose an additional restriction when the Legislature itself has declined to do so. See *Higgins v. Pascack Valley Hosp.,* 158 *N.J.* 404, 419, 730 *A.*2d 327 (1999) (urging courts not to imply certain terms to statute when excluded by Legislature).

I do not agree with the majority's conclusion that the Act's "hospital or other facility" language is intended to exclude from the Act's protections "any" Good Samaritan who has rendered emergency care in that setting. *Ante* at 258, 798 *A.*2d at 62. The

1987 language regarding the transport of victims from an accident scene "to a hospital or other facility[,]" *L.* 1987, *c.* 296, was enacted specifically to ensure that the Act protected "members of volunteer first aid, rescue and ambulance squads." Assembly Law, Public Safety, Defense and Corrections Committee, *Statement [to] Assembly [Bill] No. 2467, reprinted in N.J.S.A.* 2A:62A–1. The Legislature's purpose was merely to describe in sufficient detail the category of non-physicians who may be called on to render emergency aid while transporting a victim to a different location.

I might agree with the Court's ultimate disposition following a remand. Absent a remand, however, I would interpret the Act consistent with what I discern as its underlying purpose, namely, to ensure that as many persons as possible respond to a patient's emergent needs. Stated differently, I would not dismiss the possibility that the Legislature would rather have the hospital physician or registered nurse in a remote location respond unhesitatingly to an emergency elsewhere on the premises, than have those same professionals be slow to act, or not act at all, out of fear of litigation.

I do not advocate the wholesale immunization of physicians and other professionals in hospitals. Rather, I would continue to tether the Good Samaritan statute to its original moorings, meaning I would apply its protections unless the person who administered the emergency aid had a pre-existing duty to act. See *Praet v. Borough of Sayreville,* 218 *N.J.Super.* 218, 224, 527 *A.*2d 486 (App.Div.) (observing that "threshold question in determining the applicability of the Good Samaritan Act is whether the person claiming its immunity had a preexisting duty"), *certif. denied,* 108 *N.J.* 681, 532 *A.*2d 253 (1987).

After a remand, we might well conclude that Dr. Ranzini had such a duty and that she, and indeed most of her medical colleagues, would fall outside the purview of the Act. I am unwilling to reach that conclusion as a matter of law. Nor would I restrict the Act to all emergent situations except those found in a

hospital unless the statute explicitly contained that restriction, which it does not.

I respectfully dissent.

Justice COLEMAN joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices STEIN, LONG, LaVECCHIA, and ZAZZALI—5.

*For remandment*—Justices COLEMAN and VERNIERO—2.

*Opposed*—None.