**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4412-17T1

TIMOTHY C. ROWE, SR.,

    Plaintiff-Respondent,

v.

WILLIAM MADISON, DO,
and FAMILY PRACTICE
ASSOCIATES,

    Defendants-Appellants,

and

ASHOK R. BAPAT, MD, and
COMPREHENSIVE CANCER
& HEMATOLOGY SPECIALISTS,
PC,

    Defendants.

_____

Argued September 23, 2019 – Decided March 12, 2020

Before Judges Fasciale, Moynihan and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Docket No. L-1045-14.

Mark Alan Petraske argued the cause for appellant (Dughi Hewit & Domalewski PC, attorneys; Jessica Yifan Ma, on the briefs).

Emily A. Mc Donough argued the cause for respondent (Martin T. Mc Donough, attorney; Emily A. Mc Donough, of counsel and on the briefs).

PER CURIAM

William Madison, D.O.,[1] appeals from a May 4, 2018 order denying his motion for a mistrial and his motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, after a seven-day trial on plaintiff Timothy C. Rowe's medical malpractice claims. Under a Scafidi[2] theory of liability, plaintiff alleged that defendant failed to inform him that he had tested positive for Factor V Leiden, a genetic mutation, and that consequently, plaintiff was deprived of the opportunity to treat his condition, thereby increasing his risk of stroke and causing him to suffer an arterial stroke that rendered him permanently disabled. The jury returned a verdict for plaintiff, awarding him $852,350 in damages and attributing 55% of the ultimate injury to defendant's negligence and 45% to plaintiff's preexisting conditions. Defendant filed the

---

[1] Family Practice Associates is Dr. Madison's practice. For simplicity, we refer to Dr. Madison and Family Practice Associates collectively as defendant throughout this opinion.

[2] Scafidi v. Seiler, 119 N.J. 93 (1990).

A-4412-17T1

post-verdict motions, arguing that plaintiff failed to present sufficient evidence showing that defendant deviated from the standard of care and that this violation substantially contributed to plaintiff suffering an arterial stroke. Having reviewed the record, and in light of the applicable law, we affirm.

I.

We discern the following facts from the record. In March 2000, defendant referred plaintiff for blood testing because of plaintiff's family history of hypercoagulability problems. Plaintiff's test results showed that he tested positive for Factor V Leiden, a genetic mutation that "increases the risk of a hypercoagulable state."

On May 12, 2000, plaintiff had an appointment with defendant. The parties dispute whether defendant informed plaintiff that he had tested positive for Factor V Leiden and discussed treatment to decrease the risk of any adverse consequences. Office notes from this appointment included a variety of information but neither stated that plaintiff tested positive for Factor V Leiden nor used the words Factor V Leiden, blood clots, or hypercoagulability. While the notes indicated that the parties reviewed test results, the notes did not explicitly refer to the blood test. None of the office notes concerning plaintiff

A-4412-17T1

from May 12, 2000 through February 26, 2012 indicated that plaintiff tested positive for Factor V Leiden.

On July 29, 2012, plaintiff suffered an arterial stroke, specifically a "middle cerebral artery/cerebral vascular attack," causing right-sided weakness. After plaintiff was discharged from the hospital, he stayed at a rehabilitation center for about three weeks, where he received physical, occupational, and speech therapies, as he needed help re-learning how to walk, speak, and care for himself. Upon leaving the center, plaintiff moved into his sister's home, where he continued therapy for about eight months. Plaintiff was unable to drive for about nine months after his stroke.

On February 27, 2014, plaintiff had another appointment with defendant. Defendant's office notes from the appointment included the following notation: "SPL MCA/CVA → R hemiparesis (? 2° smoking/Factor V)." The notation outside of the parentheses means "status post left middle cerebral artery/cerebral vascular accident" leading to "right-sided weakness." The "2°" represents the term "secondary to," meaning "caused by . . . or arising out of."

On December 24, 2014, plaintiff filed a complaint for medical malpractice against defendant, Ashok R. Bapat, M.D., and Comprehensive Cancer & Hematology Specialists, advancing claims for negligent treatment and informed

consent. The claims against Dr. Bapat and Comprehensive Cancer & Hematology Specialists were later dismissed by way of summary judgment.

During discovery, plaintiff served requests for admissions on defendant and elicited, in part, the following admissions: A Factor V mutation increases the risk of a hypercoagulable state, the risk of a clotting event, and the risk of a stroke; a patient with the heterozygous "Factor V Leiden mutation [that] is not anticoagulated is at an increased risk of stroke"; and prophylactic anticoagulants (blood thinners) are a "treatment option for a patient who is positive for a Factor V abnormality." These admissions were read into the record at trial.

Plaintiff did not serve any expert reports. Defendant, however, served expert reports prepared by Dr. Ronald A. Sacher, a board-certified hematologist, and Dr. John Hocutt, a board-certified family practitioner. Both experts, as well as both parties, were deposed.

During defendant's deposition, he agreed that taking Plavix or aspirin[3] "would have been a reasonable medical option for [plaintiff]" after learning he had the Factor V mutation, but defendant explained that he would not recommend either option. Defendant also indicated that he believed smoking

---

[3] Dr. Sacher testified that Plavix and aspirin are not anticoagulants; rather, they are anti-platelet drugs.

was a risk factor for a stroke, and Factor V Leiden was a "big risk" for stroke.[4] Further, he explained that the notation in the February 27, 2014 office notes indicated that he "left there as a question that [plaintiff's] stroke could have been related to the smoking and/or the Factor V Leiden." This testimony was also read into the record at trial.

Before trial, plaintiff filed a motion to bar defendant's experts from offering testimony that would contradict defendant's responses to plaintiff's requests for admissions. Specifically, plaintiff requested that the judge bar expert testimony on the issue of causation because defendant's admissions, including that "[a] Factor V mutation increases the risk of stroke," conclusively established causation. After hearing oral argument on May 12, 2017, Judge James R. Swift denied the motion. The judge agreed with defendant that the admissions were drafted too broadly to conclusively establish causation and that defendant's experts could explain and qualify defendant's admissions. The judge also denied plaintiff's motion for reconsideration of this ruling.

---

[4] This testimony was read to the jury during trial, and the following day, counsel and the judge realized there was an apparent typographical error in the transcription, whereby the word "factor" was altered to "Factor V." The deposition testimony likely should have read that "smoking" was a big risk factor for a stroke, rather than Factor V Leiden. During summation, defendant's counsel presented this error to the jury. However, defendant does not raise this point on appeal.

A-4412-17T1

Plaintiff raised the issue again before trial. Judge Darrell M. Fineman ruled that defendant's admissions could be read to the jury, and he explained that he would instruct the jurors that those facts had been conclusively established but also that he would not direct the jurors to rely on any particular facts. He further explained that defendant could still offer explanations not inconsistent with his responses to the requests for admissions and planned to address specific objections regarding the requests for admission at sidebar.

Trial commenced over seven non-consecutive days between March 5 and 15, 2018 before Judge Fineman. We summarize the relevant testimony below.

Defendant testified that during plaintiff's May 12, 2000 appointment, defendant told plaintiff that he tested positive for Factor V Leiden but opined that there was no need to treat it with medication at that time. Instead, defendant suggested behavioral modifications, including dieting, exercising, keeping active, and quitting smoking. When presented with the office notes from this appointment, defendant acknowledged that the notes did not identify plaintiff's test results or refer to the risks associated with Factor V Leiden.

Defendant explained that Factor V "is one of the numerous clotting mechanisms that all combine to have your body form appropriate clotting when you have an injury," and it affects clotting on the venous side of the body. A

7

usual complication on the venous side is a deep vein thrombosis (DVT), which is "a blood clot in a vein in your deeper circulation." A DVT causes "swelling [and] some redness, usually in [the] calf" and can lead to a pulmonary embolism, a serious event that occurs when a clot breaks off and moves into the lungs. Defendant testified, however, that Factor V Leiden did not affect the risk for the type of stroke that plaintiff suffered, which was caused by plaque breaking off from the arteries. In this regard, defendant qualified his prior admission that Factor V Leiden increases the risk for stroke: Through "a bizarre set of events," a pulmonary embolism could lead to a stroke "if that clot was severe enough." However, he maintained that "Factor V Leiden does absolutely nothing to cause a plaque on the arterial side of the circulatory system, which is the type of stroke that [plaintiff] suffered." Defendant added that the sequela after a knee surgery would create a high risk for blood clots, and plaintiff had knee replacement surgery in 2008.

However, defendant conceded his prior admission that Factor V Leiden "increases the risk of a hypercoagulable state" and "a clotting event." He further conceded that prophylactic anticoagulants were one option for treating a patient with Factor V Leiden and that "[a] patient who is heterozygous for the R506 Factor V Leiden mutation . . . [a]nd is not anticoagulated is at an increased risk

of stroke." Defendant qualified his admissions and deposition testimony, explaining that anticoagulants or anti-platelet drugs are reasonable treatment options only after an event, such as a clot, pulmonary embolism, or stroke because the risk of complications associated with taking these medications is greater than the risk of suffering an event caused by Factor V Leiden.

Accordingly, it would have been reasonable to discuss these options with plaintiff in light of his family history, but defendant opined that he "absolutely" should not have treated plaintiff with these medications at the time. Specifically, with respect to the anti-platelet drugs, defendant testified that they were "not [the] standard of care by any means." He later conceded that he had "absolutely no idea what the law says" as to whether the decision for prophylactic treatment was to be made by him or plaintiff.

With respect to the February 27, 2014 office notices, defendant explained the notation, "SPL MCA/CVA → R hemiparesis (? 2° smoking/Factor V)." In addition to explaining what the notation means, he testified that he "wrote a question mark implying that we questioned it and that I allowed him to have that possibility." Defendant clarified that during the appointment, plaintiff was upset because his family suggested that the stroke was plaintiff's fault since he failed to quit smoking and lose weight. Defendant then discussed the possible causes

9

of his stroke with plaintiff and "did not dissuade him from the possibility that there were things that weren't under his control, including Factor V [Leiden], that may have contributed to [the stroke]." Defendant explained that he felt that "[t]he reasons that [the stroke] happened at this point in time did not seem as important to me as the welfare and mindset of my patient."

After defendant testified, the jury heard from plaintiff and his sister. Plaintiff disputed defendant's recollection of the May 12, 2000 appointment and testified that defendant told him that his test results showed he had not tested positive for Factor V Leiden, and they did not discuss "options to decrease [the] risk of an adverse event happening to [him] because of [his] Factor V [mutation]." Plaintiff and his sister both testified to a February 2013 neurology appointment, during which plaintiff told defendant that he thought defendant told him he tested negative for Factor V Leiden.

Plaintiff testified that before his stroke, he was a licensed boiler operator and was employed as a boiler engineer by the State of New Jersey at Bayside State Prison, where he earned about $60,000 per year. At the time of his stroke, he had been out of work because of his knee surgery. He also testified to his stay in the rehabilitation center and the therapy he received. He further testified that, since suffering the stroke, he has been unable to work and has been declared

permanently disabled. Thus, his only income source is social security. He continues to have trouble walking long distances, hunting, speaking clearly, following directions, and understanding complicated concepts, and he only drives within a sixty-mile radius. Since about a year before trial, he has resided with a friend.

After the close of plaintiff's case, defendant called his two experts. Dr. Sacher testified that Factor V is "one of the components of the clotting system," and individuals with Factor V Leiden are "more susceptible to clotting." When asked about the veracity of defendant's admission that Factor V Leiden increases the risk of a stroke, Dr. Sacher responded that it was true but needed qualification. He explained that there was no evidence that Factor V Leiden is "involved in arterial disease"; rather, it is only associated with venous disease. An individual can suffer from venous clotting in the brain, known as cerebral venous thrombosis, which is associated with Factor V Leiden. Venous clots do not travel to the arterial side of the heart unless an individual has foramen ovale, which is a hole in the heart. Plaintiff did not have foramen ovale and did not suffer a cerebral venous thrombosis. Thus, Dr. Sacher concluded to a reasonable degree of medical certainty that "Factor V Leiden played no role in [plaintiff's] stroke."

Dr. Sacher further testified that for a patient who is heterozygous for Factor V Leiden, such as plaintiff, the risk of a venous clot increases fivefold to tenfold. "The absolute risk of getting a clot in anybody is about .01 percent. So . . . the absolute risk, even though it's five[]fold, is still a low risk." Dr. Sacher reiterated that these percentages had to do with venous events, and there was no evidence that Factor V Leiden increases the risk of arterial disease.

When asked about using anticoagulants to treat Factor V Leiden, Dr. Sacher testified that those drugs are used when the patient develops a venous clot. They are not, however, used prophylactically for a patient with Factor V Leiden unless "a person has had a previous clot or is subjected to a situation at risk, in other words, stagnation, lying in bed for a long time or going for a surgical procedure or flying long distances in aircraft or taking birth control pills" because "the relative or the absolute risk of clotting is low and the risk of using an anticoagulant which is really bleeding is higher."

Dr. Sacher further opined that aspirin would not be used to treat venous clots in a patient with Factor V Leiden; however, on cross-examination, he conceded that, during his deposition, he agreed that "[t]hough Factor V Leiden alone does not seem to raise the risk of arterial clots, something as simple as daily therapy with low-dose aspirin may help prevent a heart attack or stroke in

12

people with Factor V Leiden if they have additional risk factors." He qualified this testimony by explaining that it is only true if the patient has a patent foramen ovale, although he had not explained this during his deposition.

Dr. Sacher testified that risk factors for arterial stroke include high cholesterol, low cholesterol, high triglycerides, smoking, and obesity, and these risk factors "compound each other." He agreed that plaintiff had most of these risk factors and explained that plaintiff's knee replacement surgery and other extended periods of immobility are "situations of risk . . . [that] increase[] the risk of an adverse clotting event."

Dr. Sacher agreed that the primary modality for diagnosing an individual with a patent foramen ovale "may still be missed or misdiagnosed." He was aware of "reports in the literature of patients being heterozygous for Factor V [Leiden] having arterial clotting events," and he had testified in other proceedings that Factor V Leiden issues are "nearly always venous." He also acknowledged that for a patient who has Factor V Leiden and is asymptomatic, the decision to provide a low-dose anticoagulant is a "debatable issue" and "depends [on] if they have other factors of genetic predisposition to venous clotting." Finally, Dr. Sacher agreed that plaintiff was taking Plavix and aspirin to decrease the risk that he has another stroke and that "if a person who was

13

predisposed to stroke took Plavix and aspirin, it would decrease the risk of a first stroke."

After Dr. Sacher's testimony, defendant called Dr. Hocutt. Like Dr. Sacher, Dr. Hocutt opined that Factor V Leiden is not associated with arterial disease. Dr. Hocutt also opined that from a family practice perspective, it was not the standard of care to prescribe aspirin, Plavix, or an anticoagulant until a patient has suffered a clot or other event because there is a risk that the medication would cause more harm than good. He also explained that the aspirin and Plavix plaintiff took after his stroke were specifically for treatment of his stroke, not Factor V Leiden. Agreeing with Dr. Sacher, Dr. Hocutt opined that the "Factor V [mutation] had nothing to do with [plaintiff's] stroke."

After hearing summations, the jury returned a verdict, awarding plaintiff $852,350 in total damages and attributing 55% of the ultimate injury to defendant's negligence and 45% to plaintiff's preexisting conditions.

Thereafter defendant moved for a mistrial and then for JNOV or, in the alternative, a new trial. Following oral argument, Judge Fineman rendered an oral decision denying defendant's motions. The judge found that plaintiff presented sufficient evidence from which the jury could find the elements of his

14

negligent treatment claim, and he rejected defendant's arguments that plaintiff's counsel made impermissible arguments during summation. This appeal ensued.

On appeal, defendant argues that the judge erred in denying his motion for JNOV because plaintiff failed to produce sufficient evidence of a deviation from the standard of care and causation. Specifically, defendant contends that plaintiff should have offered expert testimony and that he improperly relied on defendant's responses to the requests for admissions. Additionally, defendant argues that the judge erred in denying his motions for a mistrial and a new trial because during summation, plaintiff's counsel mischaracterized testimony and invoked the golden rule.

## II.

We first address the judge's denial of defendant's motion for JNOV. Before considering the sufficiency of the evidence plaintiff presented, we address defendant's contention that plaintiff improperly relied on the requests for admissions to establish causation.

## A.

As requests for admissions are discovery matters, we review rulings on them for an abuse of discretion. See Torres v. Pabon, 225 N.J. 167, 185 (2016); Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011).

15

Rule 4:22-1 governs requests for admissions and allows a party to "serve upon any other party a written request for the admission . . . of the truth of any matters of fact within the scope of [Rule] 4:10-2 set forth in the request."  Each matter is deemed admitted unless "the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney."  Ibid.  If the responding party objects, he or she "shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter."  Ibid.

> A party who considers that a matter of which an admission has been requested presents a genuine issue for trial, may not, on that ground alone, object to the request but may, subject to the provisions of [Rule] 4:23-3, deny the matter or set forth reasons for not being able to admit or deny.
>
> [Ibid.]

Requests for admissions are used "to streamline litigation by 'weeding out items of fact and proof over which there is no dispute, but which are often difficult and expensive to establish by competent evidence, and thereby expedite the trial . . . and focus the attention of the parties upon the matters in genuine controversy.'"  Hungerford v. Greate Bay Casino Corp., 213 N.J. Super. 398,

404 (App. Div. 1986) (quoting Klimowich v. Klimowich, 86 N.J. Super. 449, 452 (App. Div. 1965)).

Although there is limited authority defining the permissible scope of information that may be obtained through requests for admissions, we have identified some guiding principles. The party requesting admissions may only "seek admissions . . . regarding facts within [the] defendant['s] knowledge." Torres, 225 N.J. at 185 (finding an abuse of discretion where the judge allowed the plaintiff to read to the jury the defendants' admissions to a medical doctor's expert opinion).

Additionally, "request[s] for admissions should not be used in an attempt to establish the ultimate fact in issue" but should be limited to "requests to admit underlying facts." Essex Bank v. Capital Res. Corp., 179 N.J. Super. 523, 532-33 (App. Div. 1981). Essex Bank involved an action in which the bank alleged that its former vice president conspired to acquire "home improvement paper" that was unacceptable to the bank. Id. at 525. The former vice president served requests for admissions intending to elicit an admission that he had not exceeded his authority in acquiring the instruments. Id. at 526. We determined that these requests were inappropriate because the defendant "attempted to establish as admitted by [the] plaintiff that [the] plaintiff could prove no basis for relief

17

against him." Id. at 532. Relying on Essex Bank, we reached the same conclusion in Hungerford, 213 N.J. Super. at 401-04 (finding a request for admission inappropriate in an action concerning the reasonableness of a per-share buy-out price, where the request was intended to elicit an admission that the buy-out offer was fair and reasonable).

Having considered these principles, we conclude that plaintiff did not improperly use the requests for admissions at trial. Plaintiff sought admissions concerning defendant's interactions with plaintiff and about Factor V Leiden generally. This information was well within defendant's knowledge as plaintiff's medical doctor, and he was permitted to testify about the cause of plaintiff's stroke. See Parker v. Poole, 440 N.J. Super. 7, 17-18 (App. Div. 2015) ("[I]t is well established that a treating doctor testifying as a fact witness is permitted to testify about the cause of the patient's disease or injury[.]"); see also Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 314 (1995).

Moreover, the request did not seek admissions to establish the ultimate issue of causation. The admissions provided information about defendant's understanding of Factor V Leiden and demonstrated the way he treated plaintiff, which are relevant to whether defendant deviated from the standard of care. Further, as we later explain, these admissions were not the only evidence of

causation, as plaintiff testified and adduced favorable testimony from defendant and Dr. Sacher.

B.

We now address the sufficiency of the evidence. Because we conclude that plaintiff presented sufficient evidence to allow the jury to find in his favor, and the jurors were instructed not to consider the informed consent claim if they found that defendant deviated from the accepted standard of care in treating plaintiff, we only address the sufficiency of the evidence with respect to the negligent treatment claim.

We review a ruling on a motion for judgment de novo, applying the same standard that governed the trial court. Frugis v. Bracigliano, 177 N.J. 250, 269 (2003). "[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied[.]" Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (alteration in original) (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)). In applying this "mechanical" standard, "[t]he trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to

the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969). This standard applies to "a motion for judgment at the close of the plaintiff's case; a motion for judgment at the close [of all] the evidence; and a motion for judgment notwithstanding the verdict." Verdicchio, 179 N.J. at 30 (citing R. 4:37-2(b); R. 4:40-1; R. 4:40-2(b)).

Defendant first contends that plaintiff improperly utilized the common knowledge doctrine to establish that defendant was negligent in his treatment of plaintiff's Factor V Leiden. Specifically, defendant argues that whether his failure to treat the mutation caused plaintiff's arterial stroke is a technical matter to be determined by medical practitioners.

"The general rule in malpractice cases is that 'evidence of a deviation from accepted medical standards must be provided by competent and qualified physicians.'" Estate of Chin v. St. Barnabas Med. Ctr., 160 N.J. 454, 469 (1999) (quoting Schueler v. Strelinger, 43 N.J. 330, 345 (1964)). However,

> [i]n some medical malpractice cases, the jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts. The doctrine of common knowledge is appropriately invoked where the "carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience."

[Ibid. (quoting Rosenberg v. Cahill, 99 N.J. 318, 325 (1985)).]

In such instances, a plaintiff may proceed without expert testimony on the standard of care. See ibid. For example, whether a doctor was required to communicate the results of an exam or test is a matter not so "peculiarly within the [expertise and] knowledge of trained medical experts" as to necessitate expert testimony. Jenoff v. Gleason, 215 N.J. Super. 349, 357, 358 (App. Div. 1987) (holding expert testimony not required where radiologist failed to communicate an unusual finding to the plaintiff's treating physician).

Accordingly, we conclude that plaintiff did not improperly rely on the common knowledge doctrine. As the judge found, there was ample evidence from which the jury could find that defendant miscommunicated the test results to plaintiff, including plaintiff's testimony and the lack of any notations mentioning Factor V Leiden in defendant's notes from 2000 to 2012. If the jurors believed plaintiff's testimony, they could find that defendant deviated from the standard of care. See id. at 358. Although defendant aptly contends that plaintiff presented no expert testimony to substantiate whether defendant's failure to treat plaintiff's Factor V Leiden caused his arterial stroke, under the distinct facts of this case, this contention bears on the issue of proximate causation, which we discuss next.

A-4412-17T1

Defendant next contends that plaintiff failed to present expert testimony on proximate causation as required by Scafidi, 119 N.J. 93. Specifically, defendant contends that to the extent that plaintiff claimed he should have been treated with aspirin for other stroke risk factors, plaintiff was required to present expert testimony to support that Factor V Leiden combined with those factors to increase his risk of stroke.

Generally, "[i]n a medical-malpractice action, the plaintiff has the burden of proving the relevant standard of care governing the defendant-doctor, a deviation from that standard, an injury proximately caused by the deviation, and damages suffered from the defendant-doctor's negligence." Komlodi v. Picciano, 217 N.J. 387, 409 (2014). For cases in which both a doctor's negligence and a plaintiff's preexisting condition contribute to the harm, our Supreme Court has adopted a modified standard to evaluate causation. Verdicchio, 179 N.J. at 24; see Scafidi, 119 N.J. at 108-09.

Under this modified standard, "a jury must decide whether [(1)] any 'negligent treatment increased the risk of harm posed by a preexistent condition' and, [(2)] if so, 'whether the increased risk was a substantial factor in producing the ultimate result.'" Komlodi, 217 N.J. at 414 (quoting Scafidi, 119 N.J. at 108). If the plaintiff proves both elements, "the burden shifts to the defendant

A-4412-17T1

to show what damages should be attributable solely to the preexisting condition as opposed to the physician's negligence." Ibid.

To satisfy the first element, plaintiff was required to prove that defendant's failure to disclose that plaintiff had Factor V Leiden deprived him of the opportunity for treatment and, consequently, increased his risk of suffering an arterial stroke. Accordingly, plaintiff implicitly had to prove that some treatment option for Factor V Leiden would have decreased the risk of him suffering an arterial stroke.

Viewing the evidence in a light most favorable to plaintiff, and granting him all reasonable inferences, we conclude that plaintiff presented sufficient evidence to allow the jury to find that defendant's failure to inform plaintiff that he had Factor V Leiden increased his risk of suffering an arterial stroke. In response to the requests for admissions, defendant admitted that Factor V Leiden increases the risks of a clotting event and of a stroke, and although these admissions did not differentiate between venous and arterial strokes, defendant had the opportunity to deny this statement as overly general and then qualify it as he did with other requests. Defendant also admitted that prophylactic anticoagulants were a treatment option for Factor V Leiden. Moreover, Dr. Sacher agreed that "[t]hough Factor V Leiden alone does not seem to raise the

risk of arterial clots, something as simple as daily therapy with low-dose aspirin may help prevent a heart attack or stroke in people with Factor V Leiden if they have additional risk factors."  Indeed, plaintiff had several additional risk factors.

To satisfy the second element, plaintiff was required to prove that defendant's failure to correctly communicate plaintiff's test results was a substantial factor in causing plaintiff's arterial stroke.  "[T]he defendant's negligence need not be the sole or primary factor[.]"  Verdicchio, 179 N.J. at 25 (quoting J.D. Lee & Barry A. Lindahl, Modern Tort Law:  Liability & Litigation § 4.03, 4-4 (West Group 2002)); see Velazquez v. Jiminez, 336 N.J. Super. 10, 31-32 (App. Div. 2000), aff'd, 172 N.J. 240 (2002) (holding that a defendant's mere 3% liability for a patient's injury was sufficient to submit the issue of substantial factor causation to the jury).  "Substantial" means that "the defendant's conduct ha[d] such an effect in producing the harm as to lead reasonable men to regard it as a cause."  Verdicchio, 179 N.J. at 25 (quoting Restatement (First) of Torts § 431 cmt. a (Am. Law Inst. 1934)).  A factor is not substantial, however, if one or more other contributing factors had such a predominant effect in bringing about the harm that the defendant's negligence was insignificant.  Ibid.

Again, viewing the evidence in a light most favorable to plaintiff, and granting him all reasonable inferences, we conclude that plaintiff presented sufficient evidence to allow the jury to find that defendant's negligence was a substantial factor contributing to plaintiff's arterial stroke. Most importantly, defendant's February 27, 2014 office notes indicating that plaintiff's stroke was secondary to smoking and Factor V Leiden was persuasive evidence. See Lanzet v. Greenberg, 126 N.J. 168, 191 (1991) ("Proof of deviation elicited from the defendants themselves, because they are competent professionals, could be relied on by the jury."). Dr. Sacher's testimony also supported the jury's findings, as he testified that low-dose aspirin was a treatment option for patients with Factor V Leiden and additional risk factors, that extended periods of immobility "increase the risk of an adverse clotting event," and that risk factors for arterial stroke compound each other. Dr. Sacher also acknowledged that he was aware of "reports in the literature of patients being heterozygous for Factor V [Leiden] having arterial clotting events," while he had testified in other proceedings that Factor V Leiden is "nearly always venous."

Although defendant correctly notes that he and his experts consistently testified that Factor V Leiden plays no role in increasing the risks of arterial disease and arterial strokes, "[a] jury 'need not give controlling effect to any or

all of the testimony provided by experts even in the absence of evidence to the contrary.'" Kozma v. Starbucks Coffee Co., 412 N.J. Super. 319, 325 (App. Div. 2010) (quoting State v. Spann, 236 N.J. Super. 13, 21 (App. Div. 1989), aff'd, 130 N.J. 484 (1993)).

Accordingly, as plaintiff presented sufficient evidence that defendant deviated from the standard of care and that deviation was a substantial factor contributing to plaintiff's arterial stroke, we conclude that the judge did not err in denying defendant's motion for JNOV.

### III.

We next address the denial of defendant's motion for a new trial. We review such rulings under the same standard that bound the trial court. Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011). The judge shall grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). A miscarriage of justice is a "pervading sense of 'wrongness' . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust

result." Risko, 206 N.J. at 521 (second, third, and fourth alterations in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).

The judge considers "not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, so-called 'demeanor evidence,' and the intangible 'feel of the case' . . . gained by presiding over the trial." Dolson, 55 N.J. at 6. Therefore, a court may grant a new trial even though "the state of the evidence would not justify the direction of a verdict." Ibid. Nonetheless, we "must give 'due deference' to the [judge's] 'feel of the case.'" Risko, 206 N.J. at 522 (quoting Jastram v. Kruse, 197 N.J. 216, 230 (2008)).

Defendant contends that a new trial is warranted to avoid a miscarriage of justice because plaintiff lacked credible evidence to support a prima facie case and improperly utilized the requests for admissions to establish ultimate issues. He also maintains that plaintiff improperly advanced a theory that plaintiff should have been treated for other risks of arterial stroke irrespective of Factor V Leiden but offered no expert testimony to support this theory.

As we have explained, the trial judge did not abuse his discretion in ruling on the requests for admissions, and plaintiff presented sufficient evidence to support a claim of negligent treatment. Although defendant presented a greater

27

quantum of evidence to support his case, "[a] reviewing court should not disturb the findings of the jury merely because it would have found otherwise upon review of the same evidence." Delvecchio v. Township of Bridgewater, 224 N.J. 559, 572 (2016). Moreover, the trial judge found plaintiff's testimony to be credible, and his feel of the case warrants our deference. See Risko, 206 N.J. at 522. Accordingly, we conclude that the judge did not err in denying defendant's motion for a new trial.

IV.

Finally, we address the denial of defendant's motion for a mistrial. We review such rulings for an abuse of discretion. State v. Harvey, 151 N.J. 117, 205 (1997). When addressing "a motion for a mistrial, trial courts must consider the unique circumstances of the case." State v. Smith, 224 N.J. 36, 47 (2016).

A.

Defendant first contends that plaintiff's counsel made arguments during summation that were unsupported by the evidence. Specifically, defendant asserts that plaintiff's counsel mischaracterized Dr. Sacher's testimony by (1) arguing that the standard of care required that plaintiff be treated for his Factor V Leiden with a regiment of low-dose aspirin before a DVT or other event; (2)

failing to distinguish between arterial and venous strokes; and (3) insinuating that defendant was negligent in failing to treat plaintiff for other risk factors.

"As a general matter, 'counsel is allowed broad latitude in summation [and] counsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (alteration in original) (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)). "Nevertheless, counsel's comments must be confined to the facts shown or reasonably suggested by the evidence introduced during the course of the trial." Colucci, 326 N.J. Super. at 177. "When summation commentary transgresses the boundaries of the broad latitude otherwise afforded to counsel, a trial court must grant a party's motion for a new trial if the comments are so prejudicial that 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Bender, 187 N.J. at 431 (quoting R. 4:49-1(a)); see, e.g., Geler v. Akawie, 358 N.J. Super. 437, 466-67, 472 (App. Div. 2003) (holding that a new trial was warranted after the plaintiff's counsel "misstated material elements of the evidence").

Counsel's argument that plaintiff should have been treated with low-dose aspirin for Factor V Leiden and his additional risk factors was supported by Dr.

Sacher's agreement with a similar proposition during his deposition, as well as his testimony regarding the compounding effect of risk factors for arterial disease. Likewise, counsel had wide latitude to make arguments about plaintiff's stroke without explicitly distinguishing between arterial and venous stroke. More specifically, counsel did not mischaracterize Dr. Sacher's testimony about elevated homocysteine levels being a risk factor for stroke by failing to distinguish between arterial and venous strokes, as she simply urged the jury to discredit his testimony that plaintiff's homocysteine levels were irrelevant to determining whether Factor V Leiden contributed to his stroke. Moreover, as defense counsel did not object to this characterization during summation, we presume that it was not prejudicial. See Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 495 (2001). Lastly, plaintiff's counsel did not assert a theory that defendant should have treated plaintiff for additional risk factors irrespective of Factor V Leiden. Rather, she argued that medication was a treatment option for the combination of Factor V Leiden and other risk factors.

B.

Defendant also contends that plaintiff's counsel inappropriately invoked the "golden rule" during summation by asking the jurors to consider damages as if they were in the plaintiff's position.

It is well established that when discussing the jury's role in determining damages, an attorney may not invoke the so-called "golden rule," that is, "asking jurors to award damages in the amount that they would want for their own pain and suffering." Henker v. Preybylowski, 216 N.J. Super. 513, 520 (App. Div. 1987). Permitting an invocation of the golden rule would allow an attorney to impermissibly "encourage[] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Geler, 358 N.J. Super. at 464 (quoting Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226, 1246 (7th Cir. 1982), aff'd on other grounds, 465 U.S. 752 (1984)).

Although counsel spoke in the second person and began by stating "you can consider what it must be like or would be like to be [plaintiff] for a year," what followed was not an instruction for the jurors to determine damages based on their own personal interests. Counsel painted a picture of the difficulties that plaintiff suffered, including feeling useless and depressed, needing assistance with everything, and being unable to walk and communicate with others as he had previously done. She then asked the jury to "consider what you feel the value of that would be." Again, we note that defendant failed to object during

summation, indicating that counsel's remarks were not prejudicial when made. See Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009).

Accordingly, as plaintiff's counsel neither prejudicially mischaracterized the trial testimony nor improperly invoked the golden rule, we conclude that the denial of defendant's motion for a mistrial was proper.

To the extent that we have not addressed the parties' remaining arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION